**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LILIAN AWINO NYAWARA, individually and on behalf of all persons similarly situated,** | : | **Civil Action No.:** |
| | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **v.** | : | |
| | : | |
| **INTERSTAFF, INC.,** | : | **CLASS AND COLLECTIVE ACTION** |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |

**<u>CLASS AND COLLECTIVE COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE ........................................................................... 5

PARTIES .............................................................................................................. 5

CLASS AND COLLECTIVE DEFINITIONS..................................................... 5

FACTUAL ALLEGATIONS ............................................................................... 6

   I.   Interstaff's Business Model Preys on a Vulnerable Population ..................... 8

   II.  Interstaff's Contracts Are Designed and Operate to Force Nurses to Labor for
       Interstaff and Its Clients.............................................................................12

   III.  Nurses Reasonably Fear Substantial Harm If They Leave Their Employment
       or Are Terminated Prior to Satisfying Interstaff's Minimum Hours Requirement..........17

      A.   Interstaff Uses Threat of Financial Penalties to Coerce Nurses' Labor....................... 17

      B.   Interstaff Uses Threat of Civil Litigation to Coerce Nurses' Labor. ......................... 18

      C.   Interstaff Uses False Immigration Threats to Coerce Nurses' Labor. ........................ 21

   IV.  Interstaff Failed to Pay Proper Wages. ......................................................23

   V.   Interstaff Coerced Plaintiff Nyawara to Labor Under Threat of Serious Harm ..............25

CLASS ALLEGATIONS .................................................................................. 37

COLLECTIVE ACTION ALLEGATIONS ....................................................... 40

COUNT ONE..................................................................................................... 41

COUNT TWO..................................................................................................... 42

COUNT THREE................................................................................................. 44

COUNT FOUR................................................................................................... 44

COUNT SIX ...................................................................................................... 48

PRAYER FOR RELIEF .................................................................................... 49

JURY DEMAND ............................................................................................... 50

i

Plaintiff Lilian Awino Nyawara ("Plaintiff"), through her undersigned counsel, files this Class and Collective Action Complaint ("Complaint") against Defendant Interstaff, Inc. ("Defendant" or "Interstaff"), seeking all available remedies under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, *et seq*., the Fair Labor Standards Act of 1983, 29 U.S.C. §§201, *et seq*. ("FLSA"), and state law claims. The allegations are based on personal knowledge as to Plaintiff's own conduct and are made on information and belief as to the acts of others.

## INTRODUCTION

1.      This case concerns a labor trafficking scheme whereby Interstaff threatens a class of nurses with serious financial harm and abuse of the legal process, including immigration and litigation threats, to secure an artificially cheap and captive supply of labor, which it then sells to healthcare providers at a profit. Plaintiff alleges labor trafficking and failure to pay proper wages.

2.      Interstaff is a foreign labor recruiter who recruited Plaintiff and hundreds of other nurses ("Nurses") to work for Interstaff in Texas and across the United States. Interstaff forces the Nurses to sign unenforceable, draconian employment agreements and uses these agreements as a coercive mechanism to force the Nurses into indentured servitude.

3.      Interstaff was founded in 1998 and has hired nurses from over fifty (50) countries to staff hospitals and healthcare facilities across the United States. Interstaff has a staff of more than 200 individuals in the United States and abroad.

4.      Interstaff's business model involves recruiting Licensed Registered Nurses and bringing them to the United States to labor for Interstaff's benefit. Interstaff promotes their recruiting services by claiming that Interstaff "champion[s] [Nurses'] dreams and ensure[s] they're

met with opportunities and unwavering support."[1] In truth, however, Interstaff denies Nurses the opportunities that would otherwise be available to them by forcing Nurses to sign unconscionable contracts that state that may be liable for tens of thousands of dollars if they leave their jobs.

5.      A bedrock principle of the American labor market and Texas law—which is the state law Interstaff selected to govern its contracts—is that employers must compete for workers through wages and benefits, and not by unreasonably restraining their workers' right to seek out better opportunities. Interstaff purposefully turns that principle on its head.

6.      Interstaff requires Nurses to sign contracts that impose substantial monetary penalties ("Financial Penalties") that will be enforced if an employee fails to complete three (3) years and 6,240 hours of work for Interstaff's clients. For a Nurse to complete the designated hours within three (3) years, they must work forty (40) hours a week with no weeks off for three (3) years straight. This means that the minimum amount of time that Interstaff forces a Nurse to work for them is three years, but almost certainly more. The effect and intent of the Financial Penalties is to penalize Nurses who seek out other opportunities and to keep Nurses stuck in jobs where they are paid below market rate.

7.      Interstaff's Financial Penalties range from $25,000 to over $150,000, plus an unknown amount of "actual and consequential damages" and attorney's fees. Nurses accordingly believe they may be liable for hundreds of thousands of dollars if Interstaff deems that they breached their contract.

---

[1] *Our Mission*, Interstaff, https://www.interstaffinc.com/our-mission/ (last visited December 12, 2025).

8.     The Financial Penalties included in Interstaff's contracts are unenforceable because they levy extremely large, one-sided damages that are not based on or representative of actual damages. The Financial Penalties thus are unconscionable and invalid under Texas law.

9.     Interstaff derives its power over the Nurses by telling them that the Financial Penalties are valid and binding. Interstaff instructs the Nurses that, if they fail to carry out the term of their employment, the Nurses will be subject to tens, if not hundreds, of thousands of dollars and they will be sued or face immigration consequences.

10.    These threats make Nurses reasonably fear that, if they leave their jobs with Interstaff, they will face serious harm in the form of insurmountable debt, litigation, or immigration issues. Interstaff uses these threats of substantial harm and the abuse of the legal process to ensure a captive workforce.

11.    True to its threats, Interstaff pursues these illegal penalties from Nurses, both through informal means and through civil litigation. Nurses are aware that Interstaff aggressively pursues Financial Penalties. The Nurses' reasonable fear of having to pay back the enormous Financial Penalties or be subject to civil litigation, and consequent increased financial burden, keeps Nurses working in their jobs when they would have otherwise left.

12.    Interstaff also threatens Nurses with false immigration threats, telling Nurses that if they fail to complete the required employment term, they will be committing "visa fraud." This threat, however, is false. Interstaff's Nurses immigrate with a green card that affords them the ability to work with any employer they choose. Interstaff knows that a Nurse's decision to leave Interstaff's employment does not constitute "visa fraud," but uses this threat to keep Nurses in their jobs.

13. Interstaff uses these contracts to coerce Nurses continue laboring for them. Interstaff thereby maintains a captive workforce of Nurses who must labor for years, at a lower wage than they can make at other jobs and often under worse conditions than at other jobs, before they can terminate their employment without outrageous penalties.

14. Interstaff is motivated to trap Nurses in their jobs for years because it can sell their labor at a steep profit. With shortages of healthcare workers throughout the United States there is a high demand from healthcare providers for the unique population of skilled Nurses that international recruiters like Interstaff can supply.

15. Plaintiff brings a class action pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure asserting forced labor claims under federal law. Employers are not permitted to use or to attempt to use the threat of substantial harm, including financial harm, or abuse of the legal system to keep people trapped in their jobs. Interstaff's threats of immigration consequences, litigation, and extraordinary financial penalties if Nurses try to leave their jobs violate federal forced labor laws.

16. Plaintiff also brings a collective action against Interstaff for failure to pay the correct overtime rate. At all times relevant, Plaintiff and the Nurse Collective were employees of Interstaff, and Interstaff was an employer and/or enterprise covered by the FLSA.

17. At all times material to this action, Interstaff has been engaged in commerce or in the production of goods for commerce as defined by the FLSA. It provides health care services and employs workers across the U.S.; sells and markets its services across state lines and throughout the United States; uses telephonic transmissions crossing state lines to do business; accepts and utilizes products that have shipped across state lines; and uses connected health

4

technology and telehealth systems that allow access to its services from different locations and across state lines.

## JURISDICTION AND VENUE

18.    Jurisdiction is proper under 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States, namely 18 U.S.C. § 1581 and 29 U.S.C. § 216(b) et seq., and because 18 U.S.C. § 1595(a) provides that such actions may be brought "In an appropriate district court of the United States[.]"

19.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims, because those claims derive from a common nucleus of operative facts.

20.    Venue in this Court is proper pursuant to 28 U.S.C. §1391. Defendant maintains its principal place of business in the Southern District of Texas and conducts a substantial portion of its business activities in this District.

## PARTIES

21.    Plaintiff Lilian Awino Nyawara is a registered nurse. She worked for Interstaff from February 2023 to December 9, 2023. She is a citizen of Kenya and a lawful permanent resident of the United States. She lives in Venus, Texas. Plaintiff Awino Nyawara consented in writing to be a Plaintiff in this Action. *See* Ex. 1.

22.    Defendant Interstaff is a corporation incorporated in Texas and with its principal place of business in Texas. Interstaff's headquarters are located at 16107 Kensington Drive, #140, Sugar Land, Texas 77479.

## CLASS AND COLLECTIVE DEFINITIONS

23.    Plaintiff brings this lawsuit as a class action on behalf of themselves and all other similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). This action

satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

24.     Plaintiff brings Count I through V of this lawsuit pursuant to the Trafficking Victims Protection Reauthorization Act on behalf of a class of Nurses defined as follows:

> All persons who worked for Interstaff as a nurse in the United States during the ten (10) years prior to the filing of this complaint and signed a contract to work with Interstaff for a set number of years or hours (the "Nurse Class").

25.     Plaintiff brings Count VI of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b), as a collective action on behalf of herself and the following similarly situated persons:

> All current and former hourly paid, non-exempt nurses that worked for Interstaff at a U.S. healthcare facility which contracted with Interstaff during the past three years and who were required to complete off-the-clock trainings, and/or received extra payments, including but not limited to shift differentials, housing stipends, and bonuses, and who worked more than forty (40) hours in at least one workweek ("FLSA Collective" or "Collective Members").

26.     The Nurse Class and/or the Collective are collectively referred to as the "Class Members."

27.     Plaintiff reserves the right to redefine the Nurse Class and/or the Collective prior to notice or class certification, and thereafter, as may be warranted or necessary.

## FACTUAL ALLEGATIONS

28.     Over the last seventy-five (75) years, employers in the United States have relied on large-scale migration of foreign healthcare works to staff their healthcare facilities, especially in times of medical crisis. These workers are essential to the effective and safe functioning of the U.S. healthcare system.

29.     Recently, shortages of healthcare workers have led hospitals in the U.S. to dramatically accelerate hiring from abroad. Countries like the Philippines, Kenya, India, Nigeria, Zimbabwe, and Jamaica have historically sent trained, experienced healthcare workers to work in

the U.S. But after the start of the COVID-19 pandemic, this trickle of nurses became a flood. As of 2022, there were about 500,000 immigrant nurses in the U.S., accounting for approximately one in six nurses total.[2]

30.    During the COVID-19 pandemic, wave upon wave of COVID infections put a massive strain on U.S. healthcare systems and the healthcare workers that served them. In prior years, many healthcare systems had reduced staff. The skeletal teams that remained in 2020 were overloaded with patients, shifts were stretched beyond the standard 12-hour period, and healthcare systems were straining against the limits of safety.[3]

31.    Moreover, in the face of the risks of COVID-19 and burnout from their working conditions, healthcare workers left their jobs *en masse*. From February to April 2020 alone, the U.S. healthcare sector shed more than 1.5 million jobs—nearly 10% of the total healthcare workforce at the time.[4]

32.    Faced with staffing shortages in the United States and a healthcare crisis that required consistent, ready, and willing labor, healthcare providers turned to foreign healthcare workers to fill this urgent need. Companies like Interstaff seek to exploit the labor shortage in the U.S. healthcare system by supplying labor through using a captive foreign workforce.

---

[2] Drishti Pillai et al., <u>The Growing Role of Foreign-Educated Nurses in U.S. Hospitals and Implications of Visa Restrictions</u>, KAISER FAMILY FOUNDATION, July 10, 2024, https://www.kff.org/racial-equity-and-health-policy/the-growing-role-of-foreign-educated-nurses-in-u-s-hospitals-and-implications-of-visa-restrictions/ (last visited December 12, 2025).

[3] Aurora Almendral, <u>Rich Countries Are Importing a Solution to Their Nursing Shortages – and Poor Countries Are Paying the Price</u>, TYPE INVESTIGATIONS, Sept. 27, 2023, https://www.typeinvestigations.org/investigation/2023/09/27/rich-countries-are-importing-a-solution-to-nursing-shortages/. (last visited December 12, 2025).

[4] *Id*. (citing Federal Reserve Economic Data, https://fred.stlouisfed.org/series/CES6562000101). (last visited December 12, 2025).

33.     The high demand for healthcare workers created a dynamic whereby Interstaff is motivated to use threats of serious harm and abuse of the legal process to keep Nurses into working for them, thereby preserving Interstaff's ability both to profit off their labor and to serve healthcare providers' interest in a reliable, captive labor pool.

**I.     Interstaff's Business Model Preys on a Vulnerable Population**

34.     Interstaff's business involves recruiting Nurses, transporting them to the United States, and then selling their labor to hospitals and healthcare facilities.

35.     Interstaff was founded in 1998, and has been recruiting Nurses from over fifty (50) countries to staff hospitals and healthcare facilities in various states across the U.S.

36.     Interstaff actively recruits international nurses and international nursing students from abroad and within the U.S. territories, including Puerto Rico, Guam, Northern Mariana Islands, U.S. Virgin Islands, and American Samoa.

37.     Interstaff profits handsomely off the labor of the foreign Healthcare Workers that it recruits. Interstaff charges its client hospitals and healthcare facilities hourly fees to access the Nurses' labor. Payment for the Nurses' labor is intended to come out of that amount, with Interstaff keeping the difference.

38.     Interstaff accordingly only profits for as long as a given Nurse continues to work for the client under the Interstaff umbrella. This incentivizes Interstaff to keep the Nurses working with Interstaff for as long as possible. And the more Interstaff suppresses Nurses' wages, the more profit it makes for every hour a Nurse works.

39.     Interstaff preys on vulnerable Nurses, including Plaintiff, who are unaware of their rights. Interstaff recruits Nurses with promises that working for healthcare facilities in the United States is a pathway for economic freedom and upward mobility, which is often not available in

their home countries. Interstaff advertises hourly rates that generally are higher than what Nurses stand to make while working in their home countries. But upon arrival, Interstaff pays Nurses significantly less than their U.S. counterparts. For instance, Interstaff Nurses make less than market rates for their labor, and receive less than U.S. counterparts for additional pay, including shift differentials and bonuses. To keep them in their jobs despite the low pay, Interstaff imposes onerous restraints that force Nurses to continue working through threats of grave financial harm, false immigration consequences, and litigation.

40.    Interstaff falsely advertises to prospective Nurses that Interstaff "focus[es] on their nurses' success without any hidden costs or surprises" and that it does not "recoup any funds after nurses arrive in the U.S."[5] Interstaff recruiters likewise tell prospective Nurses that Interstaff does not charge Nurses for its services. Even when directly responding to questions about fees, Interstaff states it will "not require [nurses] to pay back anything [Interstaff] covered during the process."[6] Interstaff additionally advertises on their website that they "don't do any paycheck withholdings."[7]

---

[5] Interstaff, Inc., Facebook, August 22, 2025, available at
https://www.facebook.com/share/p/1EcuM8ZmT3/ (last visited December 12, 2025).
[6] Interstaff, Inc., Facebook, March 15, 2025, available at
https://www.facebook.com/share/p/1BtUFT7eM6/ (last visited December 12, 2025).
[7] *Frequently Asked Questions*, Interstaff, https://www.interstaffinc.com/common-questions/ (last visited December 12, 2025).



41.     Interstaff conceals, however, that any Nurse that signs up with Interstaff must sign contracts that impose dire penalties on Nurses who leave Interstaff's employment before completing the required hours set out in the contract. These contracts provide that Nurses may be liable for exorbitant fees for fabricated damages if they breach their contracts. Interstaff further conceals that they in fact do withhold from Nurses paychecks once they begin working, deducting certain amounts from their paychecks based on the advances they had originally been told they would not have to pay back.

42.     Interstaff requires that Nurses sign contracts as soon as they interview with Interstaff, which is often years before they arrive in the U.S. These contracts levy extremely high penalties if a Nurse terminates the contract, even if the Nurse never began working for Interstaff. *See* Ex. 2 ¶ 7.

43.     Interstaff tells Nurses that the contract terms, including the required hours and related penalties for failing to complete the required hours, are non-negotiable. Ex. 3.

44.     While Nurses who come into the U.S. are legally protected by the same employment laws as U.S. citizens, Interstaff knows that the Nurses it targets are generally

unfamiliar with the U.S. legal system. By immediately trapping Nurses into a contract with dire penalties, Interstaff ensures a steady stream of Nurses who will work under the provisions of the contract, at below market rates, and who do not know that the provisions are unlawful.

45.     Both Interstaff and their client healthcare providers benefit from this arrangement. Interstaff frames the limitations it places on Nurse mobility as a focus on "long-term nurse retention" and a unique selling proposition. In its marketing to healthcare providers, Interstaff distinguishes its services them from the frequent turn-over of domestic travel nurses: "our focus on long-term nurse retention and conversion to hospital core staff leads to significant costs savings compared to the high and recurring costs of domestic travel nurse contracts."[8]

46.     Interstaff advertises that its hourly and overtime rates are lower than others' and emphasizes the "costs savings" that come with using their Nurses, as compared to paying market rate. A "study" Interstaff published claims that the health system "decreased reliance on travel nurses by 50% resulting in $4 million in annual savings."[9] Interstaff's website advertises the "return on investment" that healthcare facilities and hospital will receive if they retain Interstaff's services – an ROI Calculator is available on their website that shows the cost-cutting benefits of using Interstaff's Nurses instead of the hospital's existing travel nurses.[10]

47.     Interstaff is aware that it profits heavily by taking a portion of what would be the typical market rate for the Nurses' labor. Interstaff therefore warns Nurses not to ask client facilities what they are paying to Interstaff for the Nurses' labor. But once in the United States,

---

[8] *For Hospitals: Frequently Asked Questions*, Interstaff, https://www.interstaffinc.com/for-hospitals/ (last visited December 12, 2025).
[9] *Interstaff Case Study: Large Health System Overcomes Nursing Shortages with Interstaff's International Nurse*, at p. 3, https://www.interstaffinc.com/wp-content/uploads/2025/01/conversions.pdf (last visited December 12, 2025).
[10] *Return on Investments Calculator*, Interstaff https://www.interstaffinc.com/roi-calculator/ (last visited December 12, 2025).

Nurses realize that with their experience, they could receive higher wages, better benefits, and better working conditions if they worked for hospitals directly. Market rates in the areas that Interstaff sends its Nurses are substantially higher than what Nurses earn with Interstaff. Indeed, in an online petition dated January 15, 2022, Interstaff Nurses complained that they were being paid $10 an hour less than other nurses working comparable positions in the same hospital. Ex. 4.

48.    Interstaff could address this issue by paying Nurses market rate wages, competitive with other employment options, but this would cut into Interstaff's profit. Accordingly, to keep its profits flowing and trap its Nurses at these well-below market rates, Interstaff uses oppressive monetary penalties and threats of civil litigation and immigration consequences to ensure that the Nurses face extreme barriers to leaving their jobs.

## II.    Interstaff's Contracts Are Designed and Operate to Force Nurses to Labor for Interstaff and Its Clients

49.    Interstaff requires every Nurse that it recruits to sign contracts that impose the exorbitant Financial Penalties on Nurses who fail to satisfy Interstaff's highly restrictive contractual requirements. These restraints, as well as the threats that Interstaff levies against Nurses, ultimately ensure that Nurses are forced to work for Interstaff and its clients for years, regardless of their pay or working conditions.

50.    The contract states that "Interstaff has contracted with a designated client healthcare facility to provide [the Nurse's] services for the entire term of the Agreement." Ex. 2 ¶ 3. Interstaff tells the nurses the length of the contract is "6240 hours, which roughly equates to 3 years[.]" Ex. 3.

51.    While Interstaff's contract explicitly estimates the contract term at three years, in reality, the 6,240-hour requirement is nearly impossible to meet within three years. To complete the contract in this time frame, Nurses would have to work five (5) days a week, every week, with

no sick days, holidays, vacation, or other medical or maternity leave for 156 weeks. It thus actually takes significantly longer than three years to complete the required hours.

52.    Interstaff imposes crushing Financial Penalties on Nurses who fail to meet the required term of their contract, which it describes as "damages." The "damages," however are unspecified and amount to a punitive Financial Penalty. Financial Penalties range from $25,000 to more than $150,000. Ex. 2 ¶ 7; Ex. 5 ¶ 5; Ex. 6 ¶ 6. For the average Nurse working for Interstaff, these penalties could amount to three years' salary. In each contract that Interstaff makes Nurses sign, the Financial Penalties are inflated and do not reflect any actual damages suffered by Interstaff.

53.    The contracts also provide that the Nurses will be additionally and separately responsible for certain actual and consequential expenses that Interstaff incurred in the course of recruiting and relocating the Nurses. Ex. 2 ¶ 7; Ex. 5 ¶ 5. Interstaff does not identify or provide an estimate of what these expenses are, even though Interstaff can reasonably determine how much the costs will be based on their records.

54.    Interstaff has the power to invoke the Financial Penalties at any time, for any perceived violation. Interstaff's contracts provide that the Nurses will be liable for Financial Penalties if they fail to complete the term of the agreement. The Financial Penalties also apply if Nurses are terminated "for cause," which the contracts define as including any action that Interstaff unilaterally determines to be to its material detriment. Interstaff wields a tremendous amount of power of the Nurses through its ability to invoke the Financial Penalties.

55.    The Interstaff contract provides layers of coercion and control throughout not only their employment but also their personal lives. For example, the contract explicitly provides that Interstaff may terminate a Nurse for cause upon a Nurse's inability to work, or the Nurse requiring

13

a reasonable accommodation to work, for more than six weeks. Under this provision, a Nurse would face Financial Penalties of tens of thousands of dollars on account of an extended period of illness, physical, or mental disability. This operates to impose substantial restrictions on Nurses' lives, as it could impede Nurses from securing necessary physical or mental health treatment, for fear of facing crushing Financial Penalties if it would have them unable to work, with or without an accommodation, for more than six weeks. This could apply to situations as varied as a Nurse needing a surgery that required limitations on lifting for more than six weeks or even a cesarian section, which commonly involves eight weeks of recovery time.

56.    Interstaff also requires Nurses to sign contracts that state that they will not be deployed if they are pregnant. Ex. 5 p. 1; Ex. 7. Interstaff knows that pregnancy is not a ground of inadmissibility to the U.S., yet it pressures Nurses to believe they must remain continually available for work and cannot become pregnant. Interstaff tells Nurses that they can only travel to the U.S. if they have given birth and are ready to work full time. Ex. 3.

57.    Interstaff disregards standard protections of the Americans with Disability Act ("ADA") to ensure that it maintains a captive workforce that can continue work uninterrupted. The ADA restricts employers from firing employees for having a disability. *See* 42 U.S.C. § 12101 *et seq*. The ADA supersedes conflicting contractual provisions, and contracts accordingly cannot waive this protection. *See* 42 U.S.C. § 12112(b)(2). Interstaff nevertheless uses the threat of Financial Penalties as a mechanism for Nurses to continue laboring for Interstaff, even if they must risk their physical or mental health do so.

58.    Interstaff also prohibits Nurses from working secondary positions that could cushion the impact of the Financial Penalties. Specifically, Interstaff's contracts provide that Nurses may not obtain secondary employment without Interstaff approval. Ex. 2 ¶ 4(e); Ex. 5 ¶

2(e); Ex. 6 ¶ 2(e). This is the case even though the terms of the Nurses' visas generally allow them to work for any employer they wish. And, in practice, Interstaff is unlikely to provide this approval, as Interstaff instead encourages Nurses to prioritize their Interstaff-assigned placement schedules. *Id*. Interstaff thus maintains the power to limit the Nurses to only working for Interstaff's benefits and profit.

59.     Interstaff's contracts also state that Nurses cannot work for any other agencies once they sign the first contract with Interstaff. Ex. 2 ¶ 1.2(d). Further, Interstaff's contracts stipulate that, once a Nurse signs the first contract, Interstaff can collect Financial Penalties even if a Nurse never begins working for Interstaff. Ex. 2 ¶ 7. This means that even if Interstaff has no work for them, Nurses are bound by the contract and subject to the threat of Financial Penalties.

60.     This is not theoretical. Interstaff advertises that they guarantee employment for their Nurses and, as the sponsoring employer in the immigration process, Interstaff is required to provide employment when Nurses arrive.[11] But Interstaff is not always able to provide Nurses with employment. Nevertheless, Interstaff expects and requires that Nurses wait—without pay or permission to pursue other employment—until Interstaff secures them a position.

61.     Interstaff has sued Nurses for whom they could not secure a placement. Interstaff asserts that these Nurses owed Interstaff damages because they failed to satisfy the hours requirement, despite the fact that these Nurses never began working for Interstaff.

62.     For instance, Pricy Paily, a Nurse from India, came to the U.S. and interviewed with three different hospitals through Interstaff, but she did not receive any offers. Ms. Paily was left without work or pay for months and was restricted from pursuing other employment without

---

[11] *See, for example*, *Interstaff's EB-3 Visa Program*, Interstaff https://www.interstaffinc.com/eb3-visa-overview/ (last visited December 12, 2025) ("Working with an agency guarantees a completed USRN process and employment in a US hospital.").

Interstaff's permission, by Interstaff's contracts. Ms. Paily emailed Interstaff requesting placement, but Interstaff did not respond. Ms. Paily ultimately terminated her contract because Interstaff could not find her a placement and the Interstaff contract restricted her from looking for other work. Interstaff then sued her for $128,034.70 in damages. *See Interstaff, Inc. vs. Princy Paily*, No. 1201565 (Harris Cnty. Ct. filed Mar. 20, 2023). The parties eventually settled, with Ms. Paily paying Interstaff $50,000, even though Interstaff was never able to secure her employment. *Id*.

63.    Interstaff also tells Nurses that they will be contracted to one hospital for the entity of the 6240 hours. Ex. 3. However, in instances when the hospital cancels the contract through no fault of the Nurse, Interstaff demands that Nurses move to another hospital, often many states away. If Nurses refuse, often because their families and children have settled into one place, Interstaff demands Financial Penalties.

64.    While working at Interstaff's client hospitals, Nurses are often given worse positions and shifts than other employees of the hospital. However, Nurses stay in these positions, despite the working conditions, because they are afraid of the Financial Penalties they will face from Interstaff if they leave to find better employment.

65.    Interstaff's restrictive contractual provision enables Interstaff to keep a captive workforce at the ready by forcing Nurses into an impossible position. If Nurses are not working, they must wait for a position to become open, during which time they are unable to otherwise earn money to support themselves and also unable to perform the three-year, 6,240-hour requirement that Interstaff imposes on Nurses.

66.    These multilayered restrictions also ensure that Nurses will take any job offered to them by Interstaff, out of fear of the harm Interstaff threatens as a result of a perceived breach.

16

### III. Nurses Reasonably Fear Substantial Harm If They Leave Their Employment or Are Terminated Prior to Satisfying Interstaff's Minimum Hours Requirement

67.    Interstaff's contracts operate to make Nurses reasonably fear that they must continue to work for Interstaff or face threat of serious harm. This harm takes the form of the crushing Financial Penalties, the threat of being sued to collect the Financial Penalties, and false immigration threats. Interstaff can thus maintain a captive workforce that must labor for years before they feel they can safely end their employment.

### A. Interstaff Uses Threat of Financial Penalties to Coerce Nurses' Labor.

68.    Interstaff designs and uses the Financial Penalties as outsized punishments that make it prohibitively costly for Nurses to leave their employment with Interstaff. Interstaff thereby can keep Nurses working out of fear that Nurses will have to repay tens, or even hundreds, of thousands of dollars—amounts that are grossly disproportionate to their pay.

69.    While Interstaff's contracts characterize the Financial Penalties as "damages," they are untethered from actual damages or any actual expenses Interstaff incurred in its recruitment of the Nurses. Indeed, Interstaff's contracts expressly provide that the Financial Penalties are over and above actual costs and expenses Interstaff spent on recruiting. The Financial Penalties in the Interstaff contracts operate purely punitively and are therefore per se illegal and unenforceable.

70.    Enforcing a contractual provision which operates as a penalty is against public policy. *See Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991). Texas Law will only enforce liquidated damages provisions if a court finds "(1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Cf.* Tex.Bus.Com.Code § 2.718(a); *see also Phillips,* 820 S.W.2d at 788.

71.     Even if Interstaff were to claim that the Financial Penalties were to recoup a reasonable estimate of its actual damages, this is improper. The Financial Penalties do not reflect and are untethered from actual damages. Here, damages such as immigration processing fees, flights, and hotels are easily determinable and quantifiable, making them inappropriate for liquidated damages under Texas Law. Nor are the Financial Penalties intended to recoup actual expenses Interstaff incurred in its recruitment of Nurses; the Interstaff contracts independently establish liability for such actual expenses.

72.     The Financial Penalties—ranging from $25,000 to over $100,000—are also unreasonably large on their face. They are also disproportionate when compared to the compensation paid to Nurses, who earn anywhere from $22-39 dollars an hour. For a Nurse earning $32.00 per hour, the Financial Penalties can range from half of their net yearly income to almost three times a year's salary.

73.     Such exorbitant sums operate to trap Nurses in employment with Interstaff, even if they are paid substantially less than market rate or in poor working conditions. This includes scenarios both where Nurses they are paid much less than their counterparts at the client facilities and where Interstaff instructs Nurses to wait indefinitely for a placement with no pay. Nurses routinely stay in Interstaff's employment despite wanting to leave and they do so for fear of substantial harm.

**B. Interstaff Uses Threat of Civil Litigation to Coerce Nurses' Labor.**

74.     Interstaff tells Nurses that it will bring the full force of the U.S. legal system to bear on them and sue to recover the Financial Penalties if a Nurse fails to work the full term of Interstaff's unconscionable contracts. Nurses reasonably fear the impact of not only the Financial Penalties, but the burden of defending against litigation and paying Interstaff's attorney's fees.

18

75.    The Nurses are unfamiliar with civil litigation in the United States, such that engaging in litigation in a foreign legal system is intimidating and overwhelming. Additionally, even if the Nurses were aware that Interstaff's claims against them were improper, the Nurses generally have few resources such that hiring an attorney and maintaining protracted litigation against a well-resourced adversary would be an insurmountable financial burden.

76.    Interstaff uses the Nurses' reasonable fears of litigation to deter Nurses from leaving its employment. Interstaff's contracts explicitly provide that, if Interstaff brings a lawsuit against a Nurse to enforce the agreement and prevails, the Nurse will be liable not only for whatever judgment Interstaff recovers, but also Interstaff's attorney's fees. Interstaff's practice of aggressive litigation creates an environment of fear for Nurses who understand that, if they leave their employment with Interstaff, they will face the burden of litigation and increased financial harm in the form of attorney's fees.

77.    True to its threats, Interstaff regularly sues Nurses who Interstaff claims breached its contracts and thus are liable for the Financial Penalties. These lawsuits inflict not only the threat of recovery of the Financial Penalties, but significant economic, time, and emotional burden on the Nurses that Interstaff targets.

78.    In the last two years alone, Interstaff has filed at least ten cases suing Nurses for substantial financial damages—often amounting to well-over $100,000—as well as Interstaff's attorney's fees. *See Interstaff vs. Chilonga*, No. 25-ccv-077930 (Fort Bend Cnty. Ct. filed November 7, 2025) (asserting $80,887.20 in damages due to Nurse having 4,366 hours left on her contract); *Interstaff, Inc. vs. Mecha*, No. 25-ccv-077929 (Fort Bend Cnty. Ct. filed November 7, 2025) (asserting $93,600 in damages for failing to take up employment with Interstaff); *Interstaff, Inc. vs. Olutayo Imorhoa*, No. 25-ccv-077240 (Fort Bend Cnty. Ct filed July 16, 2025) (asserting

$142,323.72 in damages because the Nurse allegedly had 5,621 hours remaining in her term of 6,240 required hours); *Interstaff, Inc. vs. Jacqueline Ndegwa*, No. 24-ccv-075851 (Fort Bend Cnty. Ct filed Nov. 22, 2024) (asserting $59,902.72 in damages because the Nurse allegedly completed only 2,431 hours out of the 6,240 required hours); *Interstaff, Inc., vs. Latoya L. Reid,* No. 24-ccv-075379 (Fort Bend Cnty. Ct filed Aug. 22, 2024) (asserting $57,150 in damages due to Nurse working only 2,430 of the 6,240 required hours); *Interstaff, Inc. vs. Leah Ann Sto Domingo*, No. 24-ccv-075380 (Fort Bend Cnty. Ct filed Aug. 22, 2024) (asserting $93,600 in damages for failure to complete the 6,240 required hours); *Interstaff, Inc. vs. Gadzikayi Mbewe*, No. 23-ccv-073877 (Fort Bend Cnty. Ct. filed Nov. 13, 2023) (asserting $93,600 of damages due "failure to work a minimum of 6,240 hours"); *Interstaff, Inc. vs. Peter Muorah*, No. 1204213 (Harris Cnty. Ct. filed May 4, 2023) (asserting $129,039 in damages, in addition to consequential damages, for failing to complete the 6,240 required hours); *Interstaff, Inc. vs. Princy Paily*, No. 1201565 (Harris Cnty. Ct. filed Mar. 20, 2023) (asserting $128,034.70 in damages for failing to complete the 6,240 required hours); *Interstaff, Inc., vs. Grahambert Rubio*, No. 23-ccv-073883 (Fort Bend Cnty. Ct. filed Nov. 13, 2023) (pursuing $25,000 as well as consequential damages and attorney's fees due to failure to complete the 6,240 required hours).

79.     Some of the Nurses who Interstaff targeted with litigation raised counterclaims— *see Rubio*, No. 23-ccv-073883 (Fort Bend Cnty. Ct filed Jan. 17, 2024) (asserting counterclaims under the TVPA); *Domingo*, No. 24-ccv-075380 (Fort Bend Cnty. Ct filed Nov. 4, 2024) (asserting breach of contract counterclaims)—but the overwhelming majority settled out of court. And regardless of the disposition of the cases, the Nurses involved were subject to significant financial impact in the form of either damages, settlement payment, or attorneys' fees.

80.     Nurses are aware of Interstaff's aggressive litigation tactics against individuals who sought to leave Interstaff employment before completing the required hours. Interstaff's Nurses are in contact with one another, prior to deploying to the U.S., and once they arrive, through social media, messaging applications, and day-to-day in their jobs. Interstaff knows that Nurses are in contact with one another and knows that if a particular Nurse is threatened with payment of the Financial Penalties or sued, that other Nurses will find out and fear the same retribution. Nurses thus reasonably fear that, if they dare to leave, they too will be embroiled in expensive, burdensome litigation. This forces Nurses to remain laboring for Interstaff.

81.     Interstaff thereby abuses the legal system to ensure that Nurses are forced to continue laboring for its benefit. Interstaff knows or should have known that the Financial Penalties in its contracts are unlawful and unenforceable. Interstaff nevertheless threatens Nurses with litigation based on its unconscionable contracts.

**C. Interstaff Uses False Immigration Threats to Coerce Nurses' Labor.**

82.     Interstaff makes Nurses reasonably fear that they cannot refuse to work for Interstaff or even agitate for improved pay or working conditions, because doing so will amount to "visa fraud" and can result in immigration consequences or loss of status.

83.     Interstaff requires internationally recruited nurses to sign an "Embassy Interview Acknowledgement" shortly before their U.S. embassy visa interview. In that document, Interstaff states:

> I understand that should I deploy and not commence work or attempt to change **any** of the conditions I have to agreed to in this agreement or other contracts, **I will be committing visa fraud**, **will be reported to the Department of Homeland Security**, and will be responsible for damages per the embassy contract. (emphasis added). Ex. 7.

84.     The "visa fraud" warning is false and materially misleading. Under U.S. immigration law, a nurse's decision to resign, seek different hours, decline reassignment to a different facility or different state, or dispute the terms of a private employment contract does not constitute "visa fraud," nor does it make the nurse removable for "fraud."

85.     Interstaff uses this "visa fraud" warning to pressure nurses to accept assignment terms dictated by Interstaff, continue working for Interstaff after arrival, and refrain from resigning, objecting to unsafe or exploitative conditions, declining relocation, or seeking alternative employment.

86.     Nurses naturally understand a warning to be reported to the Department of Homeland Security for visa fraud to be a threat to their immigration status and ability to continue living and working in the United States. If found liable for visa fraud, Nurses could face revocation of their visas, permanent bars from re-entry into the U.S., deportation, fines, and potential criminal charges with imprisonment.

87.     Interstaff is aware that the "visa fraud" warning is false and misleading. Interstaff actively recruits and petitions nurses for permanent positions in the United States. Interstaff knows that once a Nurse is admitted, the Nurse is work-authorized and not legally required to remain with its initial employer, Interstaff. Interstaff further knows that a nurse's attempt to stop working for Interstaff, decline reassignment, or contest the terms of a private contract is not, by itself, a violation that must be "reported to the Department of Homeland Security."

88.     Interstaff nevertheless deploys this "visa fraud" threat shortly before the embassy interview, and at the point of maximum leverage, to make Nurses believe they cannot safely resign or refuse an assignment without risking substantial harm in the form of immigration consequences.

89.     These threats of immigration consequences amount to abuse of the legal process.

**IV.    Interstaff Failed to Pay Proper Wages.**

90.    Interstaff does not pay Plaintiff and Nurses for all hours and did not pay proper overtime premiums for the time worked.

91.    Plaintiff and Nurses are non-exempt hourly employees who provide care and related activities for Interstaff's client's patients.

92.    Plaintiff and Nurses perform no job duties or functions that qualify for any FLSA overtime exemption.

93.    Plaintiff and Nurses are paid an hourly rate.

94.    Given the nature of their work, Plaintiff and Nurses often worked more than forty (40) hours in a workweek.

95.    Plaintiff regularly worked more than forty (40) hours a week. Plaintiff also observed and spoke to other Nurses that worked for Interstaff that stated they were working similar overtime hours.

96.    In addition to hourly wages, Nurses receive non-discretionary compensation in addition to their hourly rate of pay, including, *inter alia*, extra shift pay, shift differentials, non-discretionary bonuses, and housing stipends (collectively, "additional payments").

97.    Interstaff has a uniform policy of not properly including additional payments in Nurses' regular rate of pay.

98.    For instance, Plaintiff received $1.70 as a night shift differential.

99.    Interstaff also paid Plaintiff and Nurses "housing stipends." These housing stipends were for the benefit of employees and were considered part of Plaintiff's wages.

100.    Plaintiff received a housing stipend of $800 a month.

23

101.    Interstaff consistently fails to include Plaintiff's and Nurse's full shift differentials, housing stipend, and bonuses in the calculation of their regular rate of pay which resulted in unpaid overtime wages in violation of the FLSA.

102.    For example, during every weekly pay period from May 7, 2023, to December 9, 2023, Plaintiff was paid additional payments. But, in all these pay periods, Interstaff failed to include all the additional payments into Plaintiff's regular rate of pay to calculate the proper overtime rate.

103.    The additional payments are paid as part of Plaintiff's and Class Members' usual wages and treated as compensation along with Plaintiff's and the Class Members' compensation.

104.    The additional payments are based on a pre-determined formula that is advertised to Interstaff's non-exempt employees in advance.

105.    Interstaff's practice of excluding all forms of non-discretionary renumeration in the calculation of overtime is uniform across Interstaff's various locations in all states.

106.    Plaintiff and Nurses also work off-the-clock to complete Interstaff's required trainings.

107.    Interstaff requires Nurses to complete training prior to beginning their jobs at their client healthcare facilities. Interstaff tells Nurses that they cannot begin their jobs without completing the trainings, and that the trainings are required, but fails to pay them for the time it takes for them to do the training.

108.    For example, it took Plaintiff over 100 hours to complete the training that was required prior to beginning her job.

109.    Interstaff also requires Nurses to complete training every few months.

110.    The trainings that Nurses do while working at Interstaff's client healthcare facilities takes approximately three (3) to five (5) hours every few months, depending on how many trainings are assigned.

111.    Interstaff expects Nurses to complete these trainings but does not provide time during Nurses' shifts to do so. It also does not pay Nurses for the time they spent doing the training at home, off-the-clock.

112.    Interstaff's practice of requiring Nurses to complete off-the-clock work is uniform across Interstaff's various locations in all states.

113.    As a result of Interstaff's policies of failing to include additional payments in the regular rate of pay and failing to pay for required trainings, Interstaff fails to keep accurate records of the hours that Plaintiff and Nurses work and fails to provide accurate wage statements to Plaintiff and Nurses that reflect all hours worked.

## V.    Interstaff Coerced Plaintiff Nyawara to Labor Under Threat of Serious Harm

114.    Plaintiff's experience illustrates the way Interstaff coerces the labor of Nurses in its employment.

115.    Plaintiff is a registered Nurse and a citizen of Kenya. Plaintiff attended nursing school in Kenya and graduated in 2015. Prior to beginning her work with Interstaff, Plaintiff had approximately four (4) years of experience as a Nurse at several hospitals in Nairobi.

116.    Plaintiff wanted to move to the United States and work as a registered nurse because she wanted a better future for herself and her family.

117.    Plaintiff first heard about the opportunity to work as a nurse for Interstaff through a friend.

118.    Plaintiff applied to Interstaff for the first time in 2019. She was told that she could receive a bigger sign-on bonus if she passed the NCLEX before applying. Plaintiff did so and sent a second application in March 2021. She subsequently interviewed with Interstaff on April 6, 2021.

119.    An Interstaff employee sent Plaintiff a contract soon after the interview and told Plaintiff that she was required to sign it. Plaintiff signed the first contract on April 9, 2021 ("April 2021 contract"). Ex. 2 at p.13.

120.    The April 2021 contract stated that it did not create an employee/employer relationship between Interstaff and Plaintiff, but rather, that would only happen when Plaintiff began working with Interstaff's client health care facility in the U.S. *Id*. at ¶ 2.

121.    Despite this, the April 2021 contract included several provisions that substantially restricted Plaintiff's ability to work elsewhere. This included provisions limiting Plaintiff from contracting with another employment agency and limiting Plaintiff from working at another job without obtaining Interstaff's approval. *Id*. at ¶¶ 1.2(d)-(e).

122.    Further, the April 2021 provided that, if Plaintiff was unable to work for Interstaff (or otherwise breached the agreement), Plaintiff would be liable to Interstaff for Financial Penalties in the form of $25,000, plus other actual and consequential damages, and attorney's fees. *Id*. at ¶ 7. The contract did not specify how much Plaintiff would have to pay in total. This functionally required Plaintiff to commit to working for Interstaff, whenever Interstaff called upon her.

123.    In December 2021, Interstaff sent Plaintiff another contract. Interstaff did not tell Plaintiff why she was being given another contract, but Plaintiff understood that she didn't have a choice to sign it if she wanted to continue with Interstaff. Plaintiff signed the second contract on December 1, 2021 ("December 2021 contract"). Ex. 5 at p.7.

124.    Plaintiff's December 2021 contract had a number of additional restrictive clauses, that were designed to ensure Plaintiff's constant availability for employment.

125.    For example, the December 2021 included a provision that Plaintiff could not be deployed to the U.S. if she became pregnant. See Ex. 5 at p.1. This is in line with Interstaff's general directives to Nurses that, if they become pregnant, they must give birth before relocating to the U.S. and may relocate to the U.S. only once they feel comfortable with their infant and are ready to resume work full-time. Ex. 3.

126.    The December 2021 contract also stated that Plaintiff may not be able to choose what shifts to take. Ex. 5 ¶ 1.2. These clauses were intended to ensure that Plaintiff did not have a choice of when she could work, even if she was unable to work at those hours.

127.    The December 2021 contract stated that her contract term was for three (3) years AND 6,240 hours, and that both conditions must be satisfied. *Id*. at p.1. This is a contradiction of what Interstaff advertises. Interstaff falsely advertises to new recruits that "if you complete 6,240 hours before 36 months, your employment term is complete." Ex. 3 at p.2.

128.    The December 2021 contract also stated that she could not seek secondary employment without written permission of Interstaff, even though her immigration status allowed her to work for any employer. Ex. 5 ¶ 2(e). The contract stated that failure to complete the hours, or otherwise breach the agreement, would result in penalties for Plaintiff. *Id*. at ¶ 5.

129.    Like the April 2021 contract, the December 2021 Contract included Financial Penalties in the form of a $25,000 liquidated damages clause, which stated, "You agree to pay Interstaff US$25,000 upfront and in full for liquidated damages" and "You agree to pay Interstaff any other consequential damages and reasonable Attorney's fees, due to Your breach of contract." *Id*.

130.    The December 2021 also contract stated that if Plaintiff did not complete the contract, not only would her earned paid leave not be paid out, but that any leave she had already taken would be deducted from her last paycheck. *Id*. at ¶ 3.4(e).

131.    Interstaff's liquidated damages clause explicitly stated that she would be liable for over $25,000 if she was "unable to undertake employment with or continue to work for Interstaff for any reason not acceptable to Interstaff…" *Id*. at ¶ 5. Plaintiff understood this to mean that if she did not accept a position with Interstaff, did not work for them, or was otherwise found in breach of the agreement and terminated, she would have to pay Financial Penalties of $25,000 as well as other damages and attorney's fees. Plaintiff was unsure how much in Financial Penalties she would actually owe if she did not undertake a job with or left her job with Interstaff.

132.    Plaintiff proceeded to successfully complete the necessary requirements for immigration and placement during this initial phase of the immigration program.

133.    During this period, Plaintiff was in WhatsApp groups with hundreds of other Interstaff Nurses. Plaintiff saw that, when a Nurse complained in a WhatsApp group about the Financial Penalties, or other restrictive provisions of the contract, Interstaff staff sent messages stating Nurses had to accept the contract as is, and they could not negotiate or complain.

134.    Plaintiff successfully interviewed with one of Interstaff's clients, HCA Florida Northwest Hospital ("Northwest Hospital") in Margate, FL, and was offered and accepted a position as a Nurse at the facility once she immigrated to the United States. Plaintiff was told that Interstaff would employ Plaintiff at one hospital for the entire time that she contracted with Interstaff.

135.    The last step in the immigration process is an interview at the U.S. embassy. If approved, Plaintiff would be able to immigrate to the United States and would be issued a green card. Plaintiff waited two (2) years for her embassy interview.

136.    Just weeks before the Embassy Interview, Interstaff's Director of Immigration and Processing, Araceli Mondragon, added Plaintiff to a WhatsApp group of approximately fifty (50) other Interstaff Nurses preparing for their embassy interviews. Mondragon told the Nurses that if they wanted to obtain the "Employment Verification" form required for the embassy interview, they must quickly sign a new employment contract with Interstaff ("December 2022 contract"). *See* Ex. 6.

137.    On December 7, 2022, Plaintiff received an email from Maria Teresa Abu, an employee at Interstaff. Ex. 8. Teresa's email stated that Plaintiff's embassy interview was scheduled for January 5, 2023. The email further went on to say:

> In order to attend your visa interview, you will need to provide the consulate with an offer letter and original Visascreen [sic]. Before Interstaff can send you these documents, you will first need to complete the [attached] employment agreement and return it to Interstaff. Once this [sic] documents has [sic] been received, we will courier your embassy documents to you.

*Id*.

138.    When Plaintiff opened the new contract, she realized that the penalties were even more severe than those contained in the April 2021 and December 2021 contracts.

139.    The December 2022 contract stated that if Plaintiff breached, she would have pay Financial Penalties in the form of "Minimum Actual Damages" which consisted of 1) "Relocation Expenses – the actual costs and expenses of the relocation costs and expenses incurred by Interstaff on [behalf of the Nurse]" and 2) "Agency Damages." Ex. 6 ¶ 6. Interstaff calculates "Agency Damages" by subtracting the actual number of hours worked by the nurse from 6,240-hour

requirement and multiplying those hours by $15-25. *Id*. Plaintiff understood this to mean that if she left her job with Interstaff, she could be liable for over $150,000.

140.    Plaintiff and other Nurses in the WhatsApp group asked Mondragon why they were receiving yet another contract, and why the penalties in the contract were so high. Mondragon did not respond to their questions. Mondragon stated only that, if the Nurses wanted to immigrate to the U.S., they had to quickly sign the new contract to receive the required embassy documents that Interstaff was withholding.

141.    Plaintiff knew that if she missed her embassy interview, it could be months before she could reschedule it. Plaintiff believed that failing to sign the contract and go forward with the embassy interview would mean she would significantly delay or even lose her opportunity to relocate to and work in the United States.

142.    Additionally, at the time that she received the December 2022 Contract, Plaintiff believed that she was bound by the December 2021 Contract. The December 2021 Contract provided that Plaintiff would owe Financial Penalties of at least $25,000 if she did not undertake employment with Interstaff. Ex. 5 ¶ 5. Plaintiff feared that failing to continue in the immigration process would make her subject to these Financial Penalties, which she could not afford.

143.    Interstaff's take-it-or-leave it demand, which took place weeks before the embassy interview, after Plaintiff had invested substantial time, effort, trust, and funds in the immigration process, and after Plaintiff had signed the December 2021 contract with its Financial Penalties, left Plaintiff with no alternative but to sign the new contract. While accepting the new contract would mean the possibility of higher penalties for breach, Plaintiff understood that her only alternative was to terminate the December 2021 Contract, become liable to pay tens of thousands of dollars in financial penalties, and give up her dream to come to the U.S.

144.    Plaintiff signed the contract on December 8, 2022, one day after receiving it. Ex. 6 at p. 6.

145.    In addition to the expanded penalty, the December 2022 contract had several other restrictions. It included a provision stating that Plaintiff could not undertake secondary employment without Interstaff's written permission, and that she had to give her employment with Interstaff priority when arranging her work schedule.

146.    Like the previous contracts, the December 2022 contract also included a provision that Plaintiff could be terminated for cause if she was unable to work with or without a reasonable accommodation because of a disability for more than six (6) weeks. *Id.* at ¶ 5.

147.    After successfully completing the embassy interview, Plaintiff and her family immigrated to Margate, Florida on February 27, 2023.

148.    Although Plaintiff arrived in the U.S. in February, she did not begin working at the Northwest Hospital until April. From February to April 2023, Plaintiff was in the U.S., ready to work for Interstaff, but did not receive any pay.

149.    During this time, Interstaff sent Plaintiff a laptop and told her that she needed to complete training that was required by Northwest Hospital as part of her job. Interstaff told Plaintiff that she if she could complete the over 100 hours of training in ten (10) days, she could keep the laptop, but if she took longer than ten (10) days, she would have to pay Interstaff $250 for the laptop. Plaintiff could not afford to pay for a laptop, so she completed the training within ten (10) days. Although the training was required for her job, Plaintiff was not paid for the training time.

150.    Plaintiff's housing was arranged by Interstaff. Her rent was approximately $2,000 per month, and the landlord required a three-month security deposit ($6,000). When Plaintiff

arrived in the United States, she could not afford the deposit, and she did not know when she would get her first paycheck from Interstaff. Interstaff provided her with a cash advance for rent and other expenses and then deducted $100 from each paycheck to recover it.

151.    By not paying Plaintiff when she arrived in the U.S., and giving her an advance to pay for rent, Interstaff put Plaintiff in a position where she was indebted to and financially reliant upon Interstaff. Plaintiff was afraid to search for another way to earn money because of the debt she already owed Interstaff and because the contract penalties would be devastating. Plaintiff accordingly was forced to wait, without pay, for Interstaff to tell her that she could begin working at Northwest Hospital.

152.    At the time Plaintiff began working, she was already $11,000 in debt to Interstaff.

153.    Plaintiff began working at Northwest Hospital on April 16, 2023.

154.    Plaintiff often worked 80-90 hours weeks during her time at Northwest Hospital because there was severe understaffing at the facility. Plaintiff was concerned that the understaffing put herself and her patients at risk, and she raised this with Interstaff. However, she did not believe that she could leave Interstaff's employment because she feared having to pay the Financial Penalties in her Interstaff contracts.

155.    In October 2023, Interstaff's Director of Employee Services, Madison Moore, told Plaintiff that Northwest Hospital had cancelled their contract with Interstaff due to internal issues at Northwest Hospital. Moore told Plaintiff that her final day of work at the facility would be December 9, 2023.

156.    Plaintiffs' contracts with Interstaff did not address what would occur upon a client-facility cancellation, and Interstaff provided no clear reassignment plan. Moore eventually contacted Plaintiff only three weeks before her designated end date with Northwest Hospital.

157.     Moore told Plaintiff there were no available placements for her in Florida and that Plaintiff accordingly would have to relocate herself and her family to Texas. Moore gave Plaintiff these instructions just months after Plaintiff had enrolled her young children in school in Florida.

158.     Because Plaintiff feared having to pay Interstaff the Financial Penalties in its contracts, Plaintiff agreed to interview for a Texas placement. Plaintiff subsequently learned, however, that Interstaff did not have a firm date for her to start working and that it would be, at minimum, more than a month before she started because of holidays, relocation, and required training.

159.     Plaintiff was concerned that she would not have enough money to support herself and her family while waiting for Interstaff to be ready to station her at a healthcare facility. When Plaintiff asked if the training would be paid, Moore stated Interstaff would pay for up to ten (10) hours only and nothing beyond that. When Plaintiff asked Moore to be paid for the time that she was not assigned to a hospital, Moore told her that Interstaff could only give her $375 a week, or, at most, $575 a week.

160.     Plaintiff eventually told Moore that she could not afford to move her family without a firm start date. Plaintiff explained that, if she was not earning a proper salary, she could not afford any payments for her housing, car, or other expenses.

161.     With no confirmed plan for a replacement position forthcoming and only three days remaining before Plaintiff's separation date with Northwest Hospital, Plaintiff notified Interstaff of her resignation on December 6, 2023.

162.     Moore emailed Plaintiff on December 13, 2023, and urged her to accept the new assignment. In that same exchange, Moore threatened that if she did not accept the new placement in Texas, Interstaff would "be left with no option but to pursue damages."

163.    Moore told Plaintiff that it was their goal "to have [her] cleared to start at the first orientation in the new year, knowing returning to work is of the utmost importance." Moore asked Plaintiff if she would be willing to interview with a new client facility "as soon as possible." Interstaff, however, gave Plaintiff no guarantees about when she would get a new placement, where it would be, and how much she would earn.

164.    Despite the lack of any of these assurances, Plaintiff agreed to interview with a new facility. Plaintiff agreed to pursue work at another facility, sight unseen, because she was scared to leave Interstaff and be forced to pay the Financial Penalties.

165.    Interstaff provided no date or details for an interview. Interstaff subsequently failed to coordinate a reassignment.

166.    At that point, Plaintiff was without any income and without any assurance Interstaff would be able to timely place her in a new position.

167.    Under these circumstances, Plaintiff's fear of being unable to immediately provide for herself and her family was dire. Plaintiff determined that she had no choice but to risk Interstaff's imposition of the financial penalties, civil litigation, and immigration consequences in order to put food on her table. On December 24, 2023, Plaintiff provided Interstaff with her resignation by email.

168.    Moore responded on December 27, 2023 and told Plaintiff that she was in breach of her agreement with Interstaff and that Interstaff would be taking the next steps in response.

169.    On February 16, 2024, Moore contacted Plaintiff by email to demand that Plaintiff pay Interstaff for the damages stemming her alleged breach of contract. Moore alleged that Plaintiff owed Interstaff 1) $75,410 in Agency Damages, 2) $6,811 in advances from Interstaff,

and 3) $800 for a Reassignment Stipend, for a total of $83,021.22. Moore did not send Plaintiff any information about what the Agency Damages consisted of, or how this figure was calculated.

170.    In that email, Moore then offered Plaintiff a reduced "Payment Plan Offer," whereby she would repay Interstaff an upfront lump sum of $7,611.22 due by March 28, 2024, and $1,785 a month for fourteen (14) months, for a total of $32,601.22. Moore did not explain how Interstaff calculated this payment plan.

171.    On March 8, 2024, Plaintiff requested clarification about Interstaff's calculated damages, including whether they accounted for the $100 deductions made from her paycheck for housing.

172.    Moore responded to Plaintiff on March 11, 2024, stating that Interstaff was charging Plaintiff $25,000 in damages on top of the advances she received, and that amount was a "discount" from what she owed under the contract. Moore gave no other information about the basis for Interstaff's claim of $25,000, or more, in damages.

173.    The so-called damages Interstaff sought were much more than Plaintiff could afford to pay.

174.    On March 29, 2024, Moore emailed Plaintiff and demanded that she must pay some amount of damages, and Moore sent her banking information and an address for Plaintiff to send checks.

175.    On April 25, 2024, Moore informed Plaintiff that Interstaff had informed its legal counsel of this issue and that, if Plaintiff did not pay the advances she had received for her rental deposit back by the end of April, Interstaff would "take further action…and that will include interest on the advances plus legal fees to ensure they are paid back." Plaintiff responded the same day, expressing her concern that Interstaff's actions constituted extortion and human trafficking.

176.    Moore wrote to Plaintiff on April 26, 2025, noted that Plaintiff did not fully understand the gravity of the situation, and threatened that, if Plaintiff questioned the amount of damages she owed, this would result in "increas[ing] the legal fees you are responsible for and owe [Interstaff]."

177.    On June 27, 2024, Moore emailed Plaintiff again and threatened her that it was Interstaff's final attempt to reach an agreement on re-payment before Interstaff "took legal action." Moore informed Plaintiff that if she did not agree to pay, they would "take the next steps to ensure they are collected."

178.    Plaintiff responded to Moore on June 27, 2024, protesting that Interstaff had treated her unfairly. Plaintiff wrote that Interstaff's unfair treatment included having her perform over 100 hours of training at home, and that they failed to provide her with any income from the time she arrived in February 2023 until April 2023.

179.    In response to Plaintiff correctly identifying that she was not paid for the over 100 hours she spent doing the mandatory trainings for her job, Moore replied: "You were not paid because you were not working, you were completing requirements to get cleared for work – that's no part of the job that's what's required to do your job. As a nurse you should know that no matter what country you are in." Apart from admitting that Plaintiff was required to do the training as part of her job, Interstaff did not address Plaintiff's other complaints.

180.    On April 10, 2025, Plaintiff received a formal letter via email from Alexandra Shulman, an attorney representing Interstaff at Buchalter PC, demanding repayment of $36,811.22 on behalf of Interstaff for her alleged breach. Ex. 9.

181.    The April 10, 2025 letter falsely provided that Plaintiff had "voluntarily" signed a contract on December 8, 2022, through which she had resigned her position with Interstaff. The

letter also stated that "Interstaff contracted with a designated client healthcare facility to provide your services for the entire term of the Agreement." *Id*. In reality, at the time that Plaintiff resigned, Interstaff's contract had been canceled with Northwest, and Interstaff had not contracted for Plaintiff to provide services to any healthcare facility.

182.    The April 10, 2025 letter also stated that Plaintiff owed at least $75,871.32 in damages, which included "4,604 hours x $15/hr = $69,060 in agency damages, plus $6,811.32 in relocation expenses." *Id*. Interstaff's attorney did not indicate on what basis Interstaff claimed or calculated the $69,060 in Agency Damages. The letter also threatened that, "Should Interstaff be forced to file a lawsuit to collect, Interstaff will be entitled to seek its agency damages anywhere in the range of $15-$25/hr, plus its attorneys' fees and costs," threatening Plaintiff with an even higher penalty and civil litigation—as much as $121,911.32. *Id*. The letter then gave Plaintiff the option to pay $36,811.32 to resolve the issue prior to litigation. *Id*.

183.    At no point did Interstaff explain the basis of its purported damages.

184.    Plaintiff did not respond to Interstaff's repeated attempts to collect on the Financial Penalty in April 2025.

185.    In November 2025, Interstaff renewed its collections attempt. Plaintiff received emails from Jayson Brunio, who stated that her damages were now with "Interstaff Collections." Brunio stated that Plaintiff remained liable for the claimed Financial Penalties and that "[r]esponding now will help you avoid additional fees or further action on the account."

## CLASS ALLEGATIONS

186.    Plaintiff brings this action on behalf of the Nurse Class as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

187. <u>Numerosity</u>: The members of the Nurse Class are so numerous that joinder of all class members is impracticable. Defendant has been recruiting nurses for more than 25 years, with recruiting conducted in more than fifty (50) countries, likely putting the number of nurses recruited in the thousands. These class members can be identified based on Defendant's records.

188. <u>Commonality</u>: Common questions of law and fact exist as to all members of the Nurse Class and predominate over any questions solely affecting individual members, including but not limited to:

    a.    Whether Defendant obtains labor by using serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

    b.    Whether Defendant's practice of financial threats and control constitute serious harm or threats of serious harm in violation of 18 U.S.C. § 1589(a)(2);

    c.    Whether Defendant obtains labor by using a scheme, plan, or pattern intended to cause a person to believe that, if they did not perform such labor or services, that person would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

    d.    Whether Defendant's practice of forcing the Nurse Class to labor at client healthcare facilities constitutes a scheme, plan, or pattern intended to cause Nurses to believe that, if they did not perform such labor or services, they would suffer serious harm or physical restraint in violation of 18 U.S.C. § 1589(a)(4);

    e.    Whether Defendant knowingly recruits Nurses for forced labor;

    f.    Whether Defendant knowingly benefits from participation in a venture which obtains labor in violation of the TVPRA while "knowing or in reckless disregard of the fact" that the venture has obtained labor by that means;

g.      Whether Defendant knowingly benefits from its violations of the TVPRA;

h.      The proper measure of damages;

i.      The proper preliminary and permanent injunctive relief that must issue against Defendant; and

j.      The proper measure of punitive damages.

189.    <u>Typicality</u>: Plaintiff's claims are typical of members of the Nurse Class. For example, Plaintiff, like other putative class members, labored for Interstaff and was subject to common policies and procedures. Further, Defendant treated Plaintiff like it treated other class members, in accordance with its standard policies and practices.

190.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Nurse class Plaintiff is committed to the prosecution of this action and has retained counsel that numerous courts have found sufficiently experienced in class actions to be appointed as class counsel. There are no conflicts among Plaintiff and the Nurse Class, which she seeks to represent.

191.    Class certification is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Nurse Class predominate over any questions affecting only individual members of the Nurse Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The core principles governing Defendant's forced labor program are uniform across the Nurse Class. Class certification will also obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Common questions of law and fact also predominate as to Plaintiff's claim that Defendant attempted to obtain, recruit, and benefit from forced labor in violation of the TVPRA and state law claims. Defendant employed uniform structures, policies, and procedures in its attempt to obtain, recruit, and benefit from forced labor

performed by Plaintiff and the Nurse Class. Moreover, management of this action as a class action will not likely present any difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

192.     Plaintiff intends to send notice to all members of the Nurse Class to the extent required by Rule 23(c)(2) of the Federal Rules of Civil Procedure. The names and addresses of the class members are available from Defendant's records and other available sources.

193.     This action concerns Interstaff's policies and practices that ensure that all Nurses cannot leave their jobs without fear of serious harm. All members of the Nurse Class seek the same injunctive relief. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COLLECTIVE ACTION ALLEGATIONS

194.     Plaintiff brings this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of herself and the FLSA Collective as defined above.

195.     Plaintiff desires to pursue her FLSA claim on behalf of all individuals who opt in to this action pursuant to 29 U.S.C. § 216(b).

196.     Plaintiffs and the Collective are "similarly situated" as that term is used in 29 U.S.C. § 216(b) because, *inter alia*, all such individuals currently work or have worked pursuant to Interstaff's common business and payroll practices as described herein, and, as a result of such practices, have not been paid overtime compensation due as described herein. Resolution of this action requires inquiry into common facts, including, inter alia, Interstaff's common compensation and payroll practices.

197.     These similarly situated employees are known to Interstaff, readily identifiable, and can be easily located through Interstaff's business records.

198.    Interstaff employs and has employed many FLSA Collective members throughout the United States. These similarly situated current and former employees may be readily notified of this action through U.S. mail and/or other reasonable means, and allowed to opt in to this action, pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their claims for unpaid wages, liquidated damages, interest, attorney's fees, and costs under the FLSA.

## COUNT ONE

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)**
**18 U.S.C. §§ 1589(a) and 1595(a) – Obtaining Trafficked Labor**

**(On behalf of Plaintiff and the Nurse Class)**

199.    All previous paragraphs are incorporated as though fully set forth herein.

200.    It is a violation of the TVPRA to "knowingly provide[] or obtain[] the labor or services of a person . . . (2) by means of serious harm or threats of serious harm . . . ; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm . . . ." 18 U.S.C. § 1589(a).

201.    The TVPRA defines "serious harm" to include nonphysical harm, "including psychological, financial, or reputational harm, that is sufficiently serious . . . to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." *Id*. § 1589(c)(2).

202.    Defendant obtained the labor of Plaintiff and members of the Nurse Class through threats of serious harm and abuse of the legal system, through a scheme to make Plaintiff and members of the Nurse Class believe they would suffer serious financial harm, face collections, or be subject to lawsuits or immigration consequences.

203.    Defendant obtained discounted labor from Plaintiff and members of the Nurse Class through serious harm, threats of serious harm, and abuse of the legal system.

204.    Defendant refused to pay proper wages to Plaintiff and members of the Nurse Class for their hours worked, required them to sign contracts with unlawful provisions, and threatened them with financial harm, collections, lawsuits, and immigration consequences if they refused to labor with Interstaff.

205.    Defendant's use of such means to obtain the labor of Plaintiff and members of the Nurse Class was knowing and intentional.

206.    Plaintiff and members of the Nurse Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiff and members of the Nurse Class provided to Defendant, as well as emotional distress and other damages.

207.    Plaintiff and members of the Nurse Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT TWO

**Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA)
18 U.S.C. §§ 1589(b) and 1595(a) – Benefitting from Trafficked Labor**

**(On Behalf of Plaintiff and the Nurse Class)**

208.    All previous paragraphs are incorporated as though fully set forth herein.

209.    It is a violation of the TVPRA to "knowingly benefit" from participation in a venture which obtains labor in violation of the TVPRA, while "knowing or in reckless disregard of the fact" that the venture has obtained labor through such means. 18 U.S.C. § 1589(b).

210.    An individual may bring a civil action against a "perpetrator [] or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture

which that person knew or should have known has engaged in an act in violation" of the TVPRA. 18 U.S.C. § 1595(a).

211.    Defendant participated in, directed, and profited from a trafficking venture whose purpose was to secure and retain the labor of internationally recruited nurses through threats of serious financial harm and abuse of legal process, as described above.

212.    Defendant knowingly benefited from this venture by: (a) supplying Plaintiff and the Nurse Class to healthcare facilities on terms favorable to Defendant; (b) collecting or attempting to collect large "damages" and penalties when nurses sought to resign or refused reassignment; and (c) extending or attempting to extend nurses' work under fear of immediate personal liability.

213.    Defendant knowingly benefited from its participation in the forced labor venture described herein by obtaining discounted labor, with accordingly reduced payroll and tax obligations, allowing Defendant to repurpose funds that would otherwise be used to pay Nurses appropriately.

214.    Defendant knew, or at minimum recklessly disregarded, that the venture's retention model relied on coercive mechanisms prohibited by § 1589, including threats of serious financial harm and the threatened abuse of legal and immigration processes, rather than voluntary, market-rate employment.

215.    Plaintiff and members of the Nurse Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiff and Class members provided to Defendant, as well as emotional distress and other damages.

216.    Plaintiff and members of the Nurse Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT THREE

### Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C. §§ 1590(a) and 1595(a) – Recruiting, Harboring, and Transporting Trafficked Labor

### (On Behalf of Plaintiff and the Nurse Class)

217.    All previous paragraphs are incorporated as though fully set forth herein.

218.    It is a violation of the TVPRA to "knowingly recruit[], harbor[], transport[] . . . or obtain[] by any means, any person for labor or services in violation of" the TVPRA. 18 U.S.C. § 1590(a).

219.    Defendant knowingly recruited, harbored, and transported Plaintiff and members of the Nurse Class in violation of the TVPRA through the means described herein.

220.    Plaintiff and members of the Nurse Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiff and members of the Nurse Class provided to Defendant, as well as emotional distress and other damages.

221.    Plaintiff and members of the Nurse Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT FOUR

### Violation of the Trafficking Victims Protection Reauthorization Act (TVPRA) 18 U.S.C. §§ 1594(a) and 1595(a) – Attempted Trafficking

### (On Behalf of Plaintiff and the Nurse Class)

222.    All previous paragraphs are incorporated as though fully set forth herein.

44

223.    Attempts to violate the TVPRA are themselves violations of the TVPRA. 18 U.S.C. § 1594(a).

224.    Defendant attempts to violate 18 U.S.C. §§ 1589 and 1590 by knowingly using its structure, policies, and procedures in an attempt to obtain the labor of Plaintiff and members of the Nurse Class.

225.    Plaintiff and members of the Nurse Class suffered damages as a result of Defendant's conduct. Those damages include the value of the labor Plaintiff and Class members provided to Defendant, as well as emotional distress and other damages.

226.    Plaintiff and members of the Nurse Class are entitled to compensatory and punitive damages and restitution in amounts to be determined at trial, together with preliminary and permanent injunctive relief and reasonable attorneys' fees and the costs of this action.

## COUNT FIVE

### Violation of the Federal Labor Standards Act (FLSA)

### (On Behalf of Plaintiff and the FLSA Collective)

227.    All previous paragraphs are incorporated as though fully set forth herein.

228.    The FLSA requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at a rate not less than one and one-half (1½) times the regular rate at which she is employed. *See* 29 U.S.C. § 207(a)(1) and 29 C.F.R. § 552.100.

229.    The FLSA defines "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee…" 29 U.S.C. § 203(d).

230.    Interstaff is subject to the wage requirements of the FLSA because Interstaff is an "employer" under 29 U.S.C. § 203(d)

231.    At all relevant times, Interstaff was, and continues to be, an "employer" engaged in interstate commerce and/or in the production for commerce within the meaning of the FLSA, 29 U.S.C. § 203 and 29 C.F.R. § 552.100.

232.    During all relevant times, the members of the FLSA Collective, including Plaintiff, were covered employees entitled to the above-described FLSA's protections. *See* 289 U.S.C. § 203(e).

233.    Plaintiff and the FLSA Collective are not exempt from the requirements of the FLSA per 29 C.F.R.§ 541.3.

234.    Plaintiff and the FLSA Collective are entitled to be paid overtime compensation for all hours worked over forty (40) in a workweek.

235.    Defendant, pursuant to its policies and practices, has failed and refused to pay overtime wages for all hours worked in excess of forty (40) in a workweek by Plaintiff and the Collective Members during the relevant time period.

236.    Defendant has knowingly failed to properly compensate Plaintiff and the Collective Members' overtime wages for hours worked in excess of forty (40) in a workweek, in violation of 29 U.S.C. § 207 and 29 C.F.R. § 552.100

237.    The FLSA defines the "regular rate" as including "all remuneration for employment paid to, or on behalf of, the employee[.]" 29 U.S.C. § 207(e).

238.    The Supreme Court has held that the term "regular rate" "obviously means the hourly rate actually paid the employee for the normal, non-overtime workweek*." Bay Ridge v. Operating Co. v. Aaron*, 334 U.S. 446, 460 (1948) (quoting *Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 40 (1944)). With a few limited exceptions, all remuneration given to an employee

must be included in the employee's regular rate calculation. See 29 U.S.C. § 207(e); 29 C.F.R. § 778.108.

239.    Plaintiff and the FLSA Collective receive non-discretionary compensation in addition to their hourly rate of pay, including, *inter alia*, extra shift pay, shift differentials, housing stipends, night differentials, and sign-on bonuses.

240.    The additional payments that Interstaff provides are non-discretionary and should be included in Plaintiff's and the FLSA Collective Members' regular rate.

241.    The additional payments are paid as part of Plaintiff's and the FLSA Collective's usual wages.

242.    The additional payments are promised to Plaintiff and the FLSA Collective in advance.

243.    The additional payment amounts are predetermined and based on fixed formulas with defined metrics, causing Plaintiff and the FLSA Collective to form a reasonable and definite expectation that they receive the additional payments, and they did receive the additional payments.

244.    Interstaff denies overtime compensation on the additional payment portion of the hourly wages of Plaintiff and the FLSA Collective Members. Interstaff's actions violated and continue to violate the FLSA and its implementing regulations.

245.    Interstaff further failed to properly compensate Plaintiffs and the FLSA Collective for all hours worked while doing off-the-clock training that was mandatory, job-related, and while doing productive work.

246.    Interstaff fails to create, keep, and preserve accurate records with respect to work performed by Plaintiff and the Collective sufficient to determine their wages, hours, and other

conditions of employment in violation of the FLSA, 29 U.S.C.A. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

247.    In violating the FLSA, Interstaff has acted willfully and with reckless disregard of clearly applicable FLSA provisions.

248.    Pursuant to 29 U.S.C. § 216(b), employers such as Interstaff, who fail to pay employee wages in conformance with the FLSA shall be liable to the employee for unpaid wages, liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid wages.

<u>**COUNT SIX**</u>

**Declaratory Judgment**

**(On Behalf of Plaintiff and the Nurse Class)**

249.    All previous paragraphs are incorporated as though fully set forth herein.

250.    Plaintiff and the Nurse Class seek a declaratory judgment that Defendant's liquidated damages clause is per se illegal under Texas Law.

251.    Under Texas law, in order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Cf.* TEX. BUS. COM. CODE § 2.718(a); *see also Phillips v. Phillips,* 820 S.W.2d 785, 788 (Tex. 1991).

252.    Defendant requires Nurses to sign a contract that includes a liquidated damage provision. Interstaff's Minimum Actual Damages provision states that upon breach, Nurses "agree to immediately reimburse Interstaff [the Minimum Actual Damages] upon its demand."

253.    Defendant's Minimum Actual Damages provision is per se illegal because: 1) Defendant can, and does, easily estimate the amount of actual damages incurred by breach of contract, and 2) the Minimum Actual Damages provision is an unreasonable amount given that it

can be well over a year's take home pay for the Nurse Class, depending on how long they worked, and is disproportionate to Defendant's actual damages.

254.    So long as Defendant enforces the Minimum Actual Damages provision, whose terms are illegal and unenforceable under Texas law, Plaintiff and the Nurse Class will continue to suffer economic injury that constitutes serious financial harm. Plaintiff therefore respectfully request that this Court declare that Defendant's liquidated damages provision is illegal, unenforceable, and void, and requests such further and other relief as it deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief on behalf of herself and the Class Members:

a.    Determining that this action may proceed as a class action under Fed . R. Civ. P. 23(b)(2)-(3);

b.    Designating Plaintiff as representative for the Nurse Class and Collective, and designating Plaintiff's counsel as counsel for the Nurse Class and Collective;

c.    Issuing proper notice to the Nurse Class Collective at Defendant's expense;

d.    Leave to add additional plaintiff and/or state law claims by motion or any other method approved by the Court;

e.    Declaring Defendant committed violations of the TVPRA;

f.    Preliminary and permanent injunctive relief requiring Defendant to cease violations of the TVPRA and prohibiting violations in the future;

g.    Awarding damages as provided by the TVPRA, including punitive damages;

h.    An order permitting this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. § 216(b);

i.    Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential Collective Members;

j.    Back pay damages (including overtime compensations) and prejudgment interest to the fullest extent permitted under the law;

k.    Liquidated damages to the fullest extent permitted under the law;

l.    Declaratory judgment that the Minimal Actual Damages provision is illegal, unenforceable, and void;

m.  Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

n.    Such other and further relief as this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demand a trial by jury of all issues so triable pursuant to Fed. R. Civ. P. 38.

Dated: December 12, 2025                          Respectfully submitted,

*s/ Mariyam Hussain*
Mariyam Hussain, Fed. Bar No. 3908834
**BERGER MONTAGUE PC**
Mariyam Hussain
110 N. Wacker Drive, Suite 2500
Chicago, IL 60606
Telephone: (773) 666-4316
mhussain@bm.net

Michael Dell'Angelo, Fed. Bar No. 3874902
Michaela Wallin, Fed. Bar No. 3908837
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-4635
Facsimile: (215) 875-4604
mdellangelo@bm.net

mwallin@bm.net

Soledad Slowing-Romero*
**BERGER MONTAGUE PC**
1229 Tyler St NE, Unit 205
Minneapolis, MN 55413
Telephone: (612) 474-4230
sslowingromero@bergermontague.com

Magen E. Kellam*
**THE LAW OFFICES OF MAGEN E.
KELLAM, P.A.**
808 Wiggins Pass Road, Suite 204
Naples, FL 34110
Telephone: (239) 260-4622
magen@kellamlegal.com

*pro hac vice forthcoming*