United States District Court
Southern District of Texas

**ENTERED**

July 10, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

LILIAN AWINO NYAWARA,                           §
*individually and on behalf of all persons*     §
*similarly situated*,                            §
                                                §    CIVIL ACTION NO. H-25-5992
                        Plaintiffs,             §
v.                                              §
                                                §
INTERSTAFF, INC.,                               §
                                                §
                        Defendants.             §

**MEMORANDUM AND OPINION**

Interstaff Inc. recruits foreign nurses and places them in jobs in the United States. Lilian Awino Nyawara, on behalf of herself and a putative class of similarly situated nurses, alleges that Interstaff operates a "labor trafficking scheme" through which it "threatens a class of nurses with serious financial harm and abuse of the legal process, including immigration and litigation threats, to secure an artificially cheap and captive supply of labor, which it then sells to healthcare providers at a profit." (Docket Entry No. 1 ¶ 1). Nyawara sued Interstaff under the Trafficking Victims Protection Reauthorization Act ("TVPRA") and the Fair Labor Standards Act ("FLSA"). Interstaff has moved to dismiss the class TVPRA claims and both the individual and collective-action FLSA claims. (Docket Entry No. 17). Interstaff has also moved to strike the plaintiffs' demand for a jury trial. (*See* Docket Entry No. 18 at 24–25).

Based on the pleadings, the motion, the record, and the applicable law, the court denies the motion to dismiss and the motion to strike. (*See* Docket Entry Nos. 17, 18). The reasons are explained below.

## I.    Background

Interstaff, Inc. "is a foreign labor recruiter who recruited" Lilian Awino Nyawara "and hundreds of other nurses ('Nurses') to work for Interstaff in Texas and across the United States." (Docket Entry No. 1 ¶ 1). Nyawara alleges that "Interstaff forces the Nurses to sign unenforceable, draconian employment agreements and uses these agreements as a coercive mechanism to force the Nurses into indentured servitude." (*Id.* ¶ 2). She alleges that Interstaff "threatens" the nurses "with serious financial harm and abuse of the legal process, including immigration and litigation threats, to secure an artificially cheap and captive supply of labor, which it then sells to healthcare providers at a profit." (*Id.* ¶ 1). The crux of the complaint is "labor trafficking and failure to pay proper wages." (*Id.*).

Interstaff allegedly uses a common practice of threatening economic penalties to ensure that the nurses it recruits and places meet certain quotas. According to Nyawara, "if an employee fails to complete three (3) years and 6,240 hours of work for Interstaff's clients," Interstaff will "impose substantial monetary penalties" of $25,000 to $150,000." (*Id.* ¶¶ 6, 7). For nurses "to complete the designated hours within three (3) years, they must work forty (40) hours a week with no weeks off for three (3) years straight." (*Id.* ¶ 6). The penalties Interstaff threatens if these quotas are not met can amount to multiple times a nurse's average salary. (*Id.* ¶ 72). Nyawara alleges that as a result of these threats, nurses must work for at least three years, and likely more, are penalized for seeking "out other opportunities," and are "stuck in jobs where they are paid below market rate." (*Id.* ¶ 6).

Nyawara alleges that "Interstaff derives its power over the Nurses through contracts that it directs Nurses to sign when they agree to work for Interstaff." (Docket Entry No. 24 at 3; *see* Docket Entry No. 1 ¶ 9). She alleges that when Interstaff gets nurses to sign the contracts, it

"conceals" that they will be subject to substantial monetary penalties and exorbitant fees if they breach their contracts.  (Docket Entry No. 1 ¶ 41).  She alleges that Interstaff also conceals that it withholds money from nurses' "paychecks once they begin working, deducting certain amounts from their paychecks based on the advances they had originally been told they would not have to pay back." (*Id.*).  Interstaff's failure to disclose these penalties and fees is important, according to Nyawara, because "Interstaff requires that Nurses sign contracts as soon as they interview with Interstaff, which is often years before they arrive in the U.S." (*Id.* ¶ 42).  Because the contracts include termination fees, nurses are subject to "extremely high penalties . . . , even if the Nurse never began working for Interstaff." (*Id.*).  All these terms, Nyawara alleges, are binding and "non-negotiable." (*Id.* ¶¶ 8–9, 43, 69–70, 81).

Interstaff allegedly "tells Nurses that it will bring the full force of the U.S. legal system to bear on them and sue to recover the Financial Penalties if a Nurse fails to work the full term of Interstaff's" contracts.  (*Id.* ¶ 74).  Nyawara alleges that these threats are exploitative because the nurses "are unfamiliar with civil litigation in the United States, such that engaging in litigation in a foreign legal system is intimidating and overwhelming," and because the nurses "generally have few resources such that hiring an attorney and maintaining protracted litigation against a well-resourced adversary would be an insurmountable financial burden." (*Id.* ¶ 75).  Litigation against Interstaff allegedly is not a viable option because the Interstaff contracts require a nurse to pay Interstaff's attorney's fees in addition to damages if the nurse leaves the position Interstaff assigned before the contract has been fully performed.  (*Id.* ¶ 76).  Nyawara alleges that Interstaff's threats deter nurses "from leaving its employment." (*Id.*).

Nyawara alleges that Interstaff is "[t]rue to its threats." (*Id.* ¶ 77).  She alleges that "Interstaff regularly sues Nurses who Interstaff claims breached its contracts" and seeks to recover

the contractual penalties.  (*Id.*).  "In the last two years alone, Interstaff has filed at least ten cases suing Nurses for substantial financial damages—often amounting to well over $100,000—as well as Interstaff's attorney's fees."  (*Id.* ¶ 78 (collecting cases)).  Nyawara alleges that a few nurses asserted counterclaims in response but the "overwhelming majority settled out of court" and were "subject to significant financial impact in the form of either damages, settlement payment, or attorneys' fees."  (*Id.* ¶ 79).

Nyawara alleges that Interstaff uses the U.S. immigration system as a threat to exploit the nurses.  Interstaff allegedly "makes Nurses reasonably fear that they cannot refuse to work for Interstaff or even agitate for improved pay or working conditions, because doing so will amount to 'visa fraud' and can result in immigration consequences or loss of status."  (*Id.* ¶ 82).  "Interstaff requires internationally recruited nurses to sign an 'Embassy Interview Acknowledgement' shortly before their U.S. embassy visa interview."  (*Id.* ¶ 83).  The Acknowledgement form states that nurses "will be committing visa fraud, will be reported to the Department of Homeland Security, and will be responsible for damages per the embassy contract" if they "deploy and not commence work or attempt to change any of the conditions" of their employment with Interstaff.  (*Id.*).  Nyawara alleges that this Acknowledgement form is "false and materially misleading" because "a nurse's decision to resign, seek different hours, decline reassignment to a different facility or different state, or dispute the terms of a private employment contract does not constitute 'visa fraud,' nor does it make the nurse removable for 'fraud.'"  (*Id.* ¶ 84).  She alleges that the visa-fraud warning "pressure[s]" nurses "to accept assignment terms dictated by Interstaff, continue working for Interstaff after arrival, and refrain from resigning, objecting to unsafe or exploitative conditions, declining relocation, or seeking alternative employment."  (*Id.* ¶ 85).  According to Nyawara, Interstaff "deploys" the visa-fraud threat "shortly before the embassy interview, and at

4

the point of maximum leverage, to make Nurses believe they cannot safely resign or refuse an assignment without risking substantial harm in the form of immigration consequences." (*Id.* ¶ 88).

Nyawara alleges that Interstaff exercises coercive control over its nurses' personal lives. Interstaff allegedly reserves the right to terminate nurses who request an extended period off work due to illness, physical, or mental disability, (*id.* ¶ 55), despite ADA protections, (*id.* ¶ 57). According to Nyawara, Interstaff requires nurses "to sign contracts that state that they will not be deployed if they are pregnant" and "pressures Nurses to believe they must remain continually available for work and cannot become pregnant," in part because "cesarian section[s]" commonly involve "eight weeks of recovery time." (*Id.* ¶ 56).   Interstaff also prevents nurses from obtaining "secondary positions that could cushion the impact of the Financial Penalties" by requiring nurses to get Interstaff's approval for secondary jobs and then regularly withholding such approval.  (*Id.* ¶ 58).  Interstaff is sometimes unable to place nurses but still enforces its contracts, leaving these nurses "without work or pay for months."  (*Id.* ¶ 62).  And for those who are placed, Interstaff allegedly reserves the right to demand that they move to another hospital, often many states away, or face penalties, litigation, and severe immigration consequences.  (*See id.* ¶ 63).

Nyawara also alleges wage-and-hour violations.  She alleges that she and other nurses "are non-exempt hourly employees who provide care and related activities for Interstaff's client's patients"; "are paid an hourly rate"; and "often work[] more than forty (40) hours in a workweek." She alleges that although nurses may receive non-discretionary compensation in addition to their hourly rate of pay, including "extra shift pay, shift differentials, nondiscretionary bonuses, and housing stipends," "Interstaff consistently fails to include" their "full shift differentials, housing stipend, and bonuses in the calculation of their regular rate of pay," resulting "in unpaid overtime wages in violation of the FLSA."  (*Id.* ¶¶ 90–102).  Nyawara alleges that Interstaff forces

employees to complete training sessions, which can take over 100 hours, without pay. (*Id.* ¶¶ 103–112).

Based on these allegations, Nyawara asserts claims for: (1) violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), under 18 U.S.C. §§ 1589(a) and 1595(a) for obtaining trafficked labor; (2) violations of the TVPRA, under §§ 1589(b) and 1595(a) for benefitting from trafficked labor; (3) violations of the TVPRA, under §§ 1590(a) and 1595(a) for recruiting, harboring, and transporting trafficked labor; (4) violations of the TVPRA, under §§ 1594(a) and 1595(a) for attempting to traffic labor; and (5) violations of the Fair Labor Standards Act. (*Id.* ¶¶ 194–248). Interstaff has moved to dismiss the class TVPRA claims and both the individual and collective-action FLSA claims. (Docket Entry No. 17). Interstaff has also moved to strike the plaintiffs' demand for a jury trial. (*See* Docket Entry No. 18 at 24–25). Nyawara has responded. (Docket Entry No. 24). The court held oral argument on the motions, which are ready for ruling.

## II.     The Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (cleaned up); *Eli Lilly & Co. v. Revive Rx, LLC*, 812 F. Supp. 3d 708, 723 (S.D. Tex. 2025).

## III.    Analysis

### A.    The Motion to Dismiss the Class TVPRA Claims

Interstaff moves to dismiss the TVPRA class-wide claims, arguing that they cannot be certified as a matter of law. (Docket Entry No. 18 at 11–16). Class certification decisions must be made as soon as "practicable," FED. R. CIV. P. 23(c)(1)(A), but they require a "rigorous analysis" that often cannot be based solely on the pleadings, *see Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316–20 (3d Cir. 2008); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1051 (S.D. Tex. 2012). The court must determine whether the evidence that the plaintiffs will use to prove the complaint allegations is susceptible to class-wide proof. A "district court may dismiss the class allegation on the pleadings" only when "it is facially apparent from the pleadings that there is no ascertainable class." *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007). Interstaff does not meet this standard to dismiss the class allegations on the pleadings.

A proposed class must meet the requirements of Rule 23(a) and (b). Rule 23(a) requires the court to determine whether:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  "The proposed class must also satisfy the requirements of Rule 23(b)(1), (2), or (3)."  *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010).  In this case, Nyawara proposed a Rule 23(b)(3) class.  Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).

Interstaff argues that a Rule 23(b)(3) class cannot be certified because Nyawara cannot meet the predominance requirement.  (Docket Entry No. 18 at 11–15).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 4:50, at 196–97 (5th ed. 2012)).  This inquiry calls for a careful assessment of the substantive law, the evidence presented, and the trial plan.  *See* Jonah B. Gelbach, *The Triangle of Law and the Role of Evidence in Class Action Litigation*, 165 U. PA. L. REV. 1807, 1837–39 (2017) ("Evidence must address common questions of fact, or, at least in Rule 23(b)(3) cases, it must not be the case that individual fact questions will dominate common ones. Evidence must be admissible.  And evidence must establish the elements of the substantive law."); PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 2.01 cmt. b (Am. L. Inst. 2010) [hereinafter Aggregate Litigation] (discussing the relationship between commonality, substantive law, and the

8

evidence to be presented at trial).   Class certification is improper under Rule 23(b)(3) if an assessment of those three guideposts reveals "'some fatal dissimilarity' among class members that would make use of the class-action device inefficient or unfair." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 107 (2009)); *cf.* AGGREGATE LITIGATION § 2.02(a)(1) (authorizing aggregate treatment when it materially advances the litigation, "so as to generate significant judicial efficiencies").

The predominance inquiry in this case begins with 18 U.S.C. §§ 1589(a), 1589(b), 1590(a), and 1594(a).  Section 1589(a) provides:

> (a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means-
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> >
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> >
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

18 U.S.C. § 1589(a).  Section 1589(b) bars persons from "knowingly benefit[ing] . . . , financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a)." *Id.* § 1589(b).  Section 1590(a) bars persons from "knowingly recruit[ing] . . . or obtain[ing] by any means, any person for labor or services in violation of" Chapter 77, Title 18 of the U.S. Code. *Id.* § 1590(b).  Section 1594(a) bars attempts to violate the previous sections. *Id.* § 1594(a).

Interstaff argues that proving violations of these statutes requires "proof of fraud and coercive conduct," which the Fifth Circuit has held "cannot be certified under Rule 23(b)(3)." (Docket Entry No. 18 at 11–12). Assuming that Interstaff correctly describes the required proof for the TVPRA claims,[1] the case law is clear that there "are some cases where a plaintiff's reliance theory is capable of class-wide resolution." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 415 (5th Cir. 2017) (citing *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119–20 (2d Cir. 2013)). The Supreme Court held in *Tyson* that class certification for claims based on "representative evidence" is appropriate if the evidence "is relevant in proving a plaintiff's individual claim" and its use does not "deprive[] defendants of their right to litigate statutory defenses to individual claims." *Tyson*, 577 U.S. at 455, 458. The Fifth Circuit's en banc holding in *Torres* applies *Tyson* and concludes that the plaintiffs could "use a common inference of reliance to prove proximate causation under RICO." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 643 (5th Cir. 2016) (en banc). *Torres* is consistent with how *Tyson* is applied in other circuits as well.

---

[1] Nyawara argues that the issue of reliance is not subjective, but objective, relying on subsection (c)(2)'s reasonable-person language. *See* 18 U.S.C. § 1589(c)(2) ("The term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."). That reading of the statute makes certification easier because when the law adopts an objective, reasonable-person standard, that element "can be proved through evidence common to the class." *Amgen*, 568 U.S. at 467. Many courts have adopted this reading of the TVPRA, rejecting arguments that the proof of causation precludes a predominance finding. *See, e.g.*, *Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. LA CV10-01172 JAK, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-CV-1302 (NG) (JO), 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018); *Rosas v. Sarbanand Farms, LLC*, 329 F.R.D. 671, 689–90 (W.D. Wash. 2018); *Casilao v. Hotelmacher LLC*, No. CIV-17-800-SLP, 2021 WL 4487984, at *11 (W.D. Okla. Sept. 30, 2021); *Magtoles v. United Staffing Registry, Inc.*, No. 21CV1850KAMPK, 2022 WL 1667005, at *8 (E.D.N.Y. May 25, 2022); *Yeend v. Akima Glob. Servs., LLC*, No. 1:20-CV-01281 (AMN/PJE), 2025 WL 959968, at *15 (N.D.N.Y. Mar. 31, 2025). A minority of courts have disagreed with this reading of § 1589(a) on the ground that it ignores the statute's "by means of" requirement. 18 U.S.C. § 1589(a); *see, e.g.*, *Menocal v. GEO Grp., Inc.*, 635 F. Supp. 3d 1151, 1191 (D. Colo. 2022). The court need not resolve this issue to rule on the motion to dismiss.

10

*See, e.g., Klay v. Humana Inc.*, 382 F.3d 1241 (11th Cir. 2004); *U.S. Foodservice*, 729 F.3d at 119–20, including the Tenth Circuit, which affirmed a class certified under the TVPRA, *see Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 919–22 (10th Cir. 2018).

In *Menocal*, the plaintiffs alleged that they were subjected to forced labor in an Immigration and Customs Enforcement facility in Colorado. *Id.* at 910. The plaintiffs challenged two programs: "(1) the Housing Unit Sanitation Policy, which required all detainees to clean their common living areas; and (2) the Voluntary Work Program, which compensated detainees $1 a day for performing various jobs." *Id.* The Tenth Circuit ruled that the class action could proceed. The court explained, first, that "a TVPA class member could individually establish causation based on circumstantial evidence." *Id.* at 919. A class member could, for example, present evidence that he or she received notice of the "Sanitation Policy's terms, including the possible sanctions for refusing to clean," and then "performed housing unit cleaning work for GEO when assigned to do so." *Id.* at 919–20. The court explained that "because the TVPA class allegations are based on a single, common scheme, class members share the relevant circumstantial evidence in common, thus making class-wide proof possible." *Id.* at 920. The class members had argued that the Sanitation Policy applicable to all detainees "provide[d] the 'glue' that h[eld] together the class members' reasons for performing housing unit cleaning duties assigned by GEO." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011)). The Tenth Circuit relied on the Fifth Circuit's *Torres* decision to reject the defendant's argument that individual defenses should preclude certification, explaining that the defendant had pointed to no "individualized rebuttal evidence" after "three months of discovery." *See id.* at 921–22 (citing *Torres*, 838 F.3d at 644)).

Under *Tyson*, *Torres*, and *Menocal*, the plaintiffs may pursue class certification in this case. Nyawara alleges that Interstaff's contracts impose financial penalties on any nurse who fails to

11

complete the required 6,240 hours of work, (Docket Entry No. 1 ¶¶ 6–7, 49–54); that every nurse signed materially identical versions of these non-negotiable contracts as a condition of employment, (*id.* ¶¶ 43, 49, 52); that Interstaff had a common policy of forcing nurses, before their embassy interviews, to sign acknowledgements and contracts that imposed additional burdensome conditions, (*id.* ¶¶ 83–88); and that Interstaff systematically enforced its contracts through threats of onerous financial penalties, severe negative immigration consequences, and litigation based on unconscionable contract terms, (*see id.* ¶¶ 74, 78–81).  "[A]n inference of class-wide causation" is appropriate when there is a common scheme of misconduct against each plaintiff, "such that they are similarly situated." *Owino v. CoreCivic, Inc.*, No. 17-CV-1112 JLS (NLS), 2020 WL 1550218, at *28 (S.D. Cal. Apr. 1, 2020), *aff'd*, 60 F.4th 4378 (9th 2022); *see Tanedo v. E. Baton Rouge Par. Sch. Bd.*, No. LA CV10-01172 JAK, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011) ("[T]he gravamen of Plaintiffs' TVPA claim is that it was the scheme of hidden fees and contracts that ultimately compelled them to work; this issue predominates over the details of how Defendants communicated with Plaintiffs.").[2]

Interstaff opposes the class claims because Nyawara's "individual circumstances are facially apparent."  (Docket Entry No. 18 at 12).  Those circumstances make up Nyawara's personal story.  The certification issue is whether Nyawara's personal story is sufficiently similar

---

[2] Some courts facing similar allegations and claims under the TVPRA have denied a motion to dismiss and also found that the evidence was insufficient to support class certification. *Compare Francis v. APEX USA, Inc.*, 406 F. Supp. 3d 1206, 1214 (W.D. Okla. 2019) (denying the motion to dismiss), *with Francis v. APEX USA, Inc.*, No. CIV-18-583-SLP, 2021 WL 4487985, at *12 (W.D. Okla. Sept. 30, 2021) (denying the motion for class certification).  In cases that have denied certification, the evidence often showed that the class members or the company's policies were not cohesive enough to make the claims susceptible to class resolution. *See, e.g.*, *Panwar v. Access Therapies, Inc.*, No. 1:12-CV-00619-TWP, 2015 WL 329013, at *6 (S.D. Ind. Jan. 22, 2015) (explaining that "the employees were recruited from various countries, the terms of the contracts were different, the promissory note amounts were different, employees did not all work in the same state, and they did not have the same working conditions"); *David v. Signal Int'l, LLC*, No. CIV.A. 08-1220, 2012 WL 10759668, at *21–22 (E.D. La. Jan. 4, 2012) (similar).

in relevant respects to the personal stories of the other nurses she seeks to represent. *See* FED. R. CIV. P. 23(a)(3), (b)(3); *Amgen*, 568 U.S. at 470 (explaining that dissimilarities are "fatal" if they "make use of the class-action device inefficient or unfair" (quoting Nagarada, *Aggregate Proof*, at 107)). Nyawara alleges that "every" nurse signed the same type of contract that she signed, (Docket Entry No. 1 ¶ 49), and that the "core principles" of Nyawara's "forced labor program are uniform across" the class of nurses, (*id.* ¶ 191). Class certification discovery should be targeted to determine whether Nyawara and the other nurses present common questions of law or fact; whether her claims are typical of the other nurses' claims; whether she is an adequate representative of the other nurses; and whether common issues predominate over individual issues so as to make class treatment superior to individual litigation. The court will then conduct the "rigorous analysis," *Falcon*, 457 U.S. at 161; *Hydrogen Peroxide*, 552 F.3d at 316–20; *Heartland Payment Sys*, 851 F. Supp. 2d at 1051, needed to determine certification. This analysis cannot be conducted on the basis of the motion to dismiss.

At this stage, the court cannot find that a class-wide trial would break down into a series of individual claims or "deprive[]" Interstaff of its "right to litigate statutory defenses to individual claims." *Tyson*, 577 U.S. at 455, 458; *see Menocal*, 882 F.3d at 921–22 (citing *Torres*, 838 F.3d at 644). Interstaff's motion to dismiss the class TVPRA claims is denied.

### B.       The FLSA Claims

#### 1.       The Individual FLSA Claims

Nyawara alleges four FLSA violations: (1) failure to pay overtime; (2) failure to include non-discretionary compensation in the regular rate of pay; (3) failure to compensate for all hours worked while performing off-the-clock mandatory training; and (4) failure to create, keep, and

preserve accurate records.  Interstaff moves to dismiss each allegation.  (Docket Entry No. 18 at 16).

### i.    Overtime

The FLSA states that for "[e]mployees engaged in interstate commerce . . . no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  "To show a violation of the FLSA's overtime requirements, a plaintiff must allege (1) that he was employed by the defendant; (2) that his work involved interstate activity; and (3) that he performed work for which he was undercompensated."  *Coleman v. John Moore Servs., Inc.*, No. CIV.A. H-13-2090, 2014 WL 51290, at *2 (S.D. Tex. Jan. 7, 2014).

To adequately allege the amount of overtime owed, a plaintiff may plead "sufficient facts to put the defendant on notice as to the approximate date ranges, as well as the approximate number of hours worked, for which the plaintiff claims he was under-compensated."  *Guilbeau v. Schlumberger Tech. Corp.*, No. SA-21-CV-0142-JKP-ESC, 2022 WL 199271, at *4 (W.D. Tex. Jan. 21, 2022) (quoting *Robinson v. RWLS, LLC*, No. SA-16-CA-00201-OLG, 2016 WL 9308422, at *2 (W.D. Tex. Aug. 11, 2016)), *report and recommendation adopted by*, 2016 WL 9308525 (W.D. Tex. Sept. 16, 2016).

Nyawara identified the period of the alleged violations (February to December 2023), the approximate number of hours she worked (80–90 per week), and the specific period of unpaid overtime (every week from May 7 to December 9, 2023).  (Docket Entry No. 1 ¶¶ 16–17, 102, 148–49, 153–54).  Nyawara also offered an explanation for why she worked such long hours: the "severe understaffing at the facility" where she worked "put herself and her patients at risk."  (*Id.*

14

¶ 154).  These allegations are sufficient to state a claim.  *See Perez v. Prime Steak House Rest. Corp.*, 939 F. Supp. 2d 132, 141–42 (D.P.R. 2013) (denying a motion to dismiss when the complaint alleged that the plaintiffs were regularly scheduled to work five days per week, "the regular shift was six (6) or seven (7) daily hours," and the overtime hours they worked came from working "2 or 3 daily hours devoted to tasks related to preparing [d]efendant [PSHRC's] establishment before it opened its doors to its clients and related to the closing of the establishment," because these allegations provided "both an estimate of the hours worked and a general idea of the type of work performed"); *see Coleman*, 2014 WL 51290, at *3 (citing *Perez*).

### ii.        The Regular Rate

Section 207 of the FLSA provides, in relevant part:

> [T]he "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include . . . [s]ums paid in recognition of services performed during a given period if . . . both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments . . . .

29 U.S.C. § 207(e)(3).  The regular rate "cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee."  *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 464 (1948).  "[C]ourts are required to look beyond that which the parties have purported to do" and find "the hourly rate actually paid for the normal, non-overtime workweek."  *149 Madison Ave. Corp. v. Asselta*, 331 U.S. 199, 204 (1947).

Nyawara alleges that "[i]n addition to hourly wages, Nurses receive non-discretionary compensation in addition to their hourly rate of pay," including "extra shift pay, shift differentials, nondiscretionary bonuses, and housing stipend."  (Docket Entry No. 1 ¶ 94).  She alleges that "Interstaff has a uniform policy of not properly including additional payments in Nurses' regular

15

rate of pay." (*Id.* ¶ 95). She alleges that nurses receive "$1.70 as a night shift differential" and "a housing stipend of $800 a month." (*Id.* ¶¶ 98–100). She alleges that Interstaff "consistently fails to include" the "full shift differentials, housing stipend, and bonuses in the calculation of their regular rate of pay." (*Id.* ¶ 101). Nyawara alleges that "during every weekly pay period from May 7, 2023, to December 9, 2023," she was "paid additional payments" but in "all these pay periods," she did not receive the "proper overtime rate." (*Id.* ¶ 102). She alleges that these bonuses and added payments were "based on a pre-determined formula that is advertised to Interstaff's non-exempt employees in advance," (*Id.* ¶ 104), and were not included in the calculation of overtime owed under the statute.

Interstaff argues that these allegations are not specific enough because Nyawara did not identify the amount of the advance payments she received; did not state if she received her sign-on bonus for passing the NCLEX exam; and did not state how often she worked the night shift and received differential payments. (Docket Entry No. 33 at 6–7). The court disagrees with Interstaff's argument. The complaint adequately alleges that the housing stipend should have been part of Nyawara's regular rate because it was an $800 monthly stipend that was advertised and promised before she started working under contract with Interstaff. (Docket Entry No. 1 ¶¶ 96–102, 104). The allegations that Interstaff handles bonuses and differential payments as part of an "an ongoing scheme" to avoid paying the statutorily required overtime rate are sufficiently specific to withstand dismissal. *In re Juliet Homes, LP*, No. 07-36424, 2010 WL 5256806, at \*19 (Bankr. S.D. Tex. Dec. 16, 2010) (citing *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1039, 1049 (S.D. Tex. 1998)); *cf. Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1187 (11th Cir. 2025) ("Rule 9(b)'s pleading standards should be relaxed in appropriate circumstances to aid those alleging prolonged multi-act schemes—like the one alleged here—if the plaintiff

16

alleges at least some examples to lay a complete foundation for the rest of his allegations." (cleaned up)). Nyawara's failure to specifically allege the amounts of the NCLEX-exam bonus or night-shift differentials does not require dismissal; she has sufficiently pleaded an ongoing scheme to deprive nurses of compensation that should have been included in their compensation.

### iii.    Off-the-Clock Training

"Under the FLSA, time spent on job-related training activities are generally compensable." *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 916 (S.D. Tex. 2009) (citing *Moreau v. Klevenhagen*, 956 F.2d 516, 521 (5th Cir. 1992)). Employers can avoid paying for training only if all four of the following requirements are met: "(1) attendance is outside of the employee's normal hours; (2) attendance is voluntary; (3) the training is not directly related to the employee's job; and (4) the employee does not perform any productive work during the training." *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 194 (E.D.N.Y. 2015).

Nyawara alleged that Interstaff instructed that the training was "required to do [her] job," that attendance was not voluntary, and that the training was directly related to her job. (Docket Entry No. 1 ¶¶ 107, 109, 179). Nyawara alleged that it took her "100 hours to complete the training that was required prior to beginning her job"; that she had to "complete training every few months" after she started work; and that it takes "approximately three (3) to five (5) hours every few months, depending on how many trainings are assigned." (Docket Entry No. 1 ¶¶ 107–110). Because "Interstaff expects Nurses to complete these trainings but does not provide time during Nurses' shifts to do so," the training time regularly goes unpaid, because nurses complete them "at home, off-the-clock." (*Id.* ¶ 111).

Nyawara has adequately alleged an off-the-clock training claim.

17

### iv.        Record Keeping

Failures to comply with the FLSA's recordkeeping provisions do not create a private right of action. *See Castillo v. Givens*, 704 F.2d 181, 198 n.41 (5th Cir. 1983) (the FLSA does not contain a private enforcement mechanism to keep records); *see also Lobo v. Sprint Safety, Inc.*, No. 4:19-cv-3934, 2020 WL 1659888, at *2–3 (S.D. Tex. Mar. 30, 2020) (dismissing the plaintiff's recordkeeping violations because the FLSA does not contain a private right of action for recordkeeping violations). Evidence of recordkeeping violations can be used to support FLSA claims. *See Lobo*, 2020 WL 1659888, at *2–3.

### 2.        The Collective Action Claims

Courts are divided over whether defendants can move to strike collective-action claims before a motion for certification. *Butler v. TFS Oilfield Servs., LLC*, No. SA-16-CV-1150-FB, 2017 WL 7052308, at *6 (W.D. Tex. May 17, 2017) (collecting cases), *report and recommendation adopted*, No. CV SA-16-CA-1150-FB, 2017 WL 7052276 (W.D. Tex. June 9, 2017). This court has held that "plaintiffs need not plead facts to support the propriety of a collective action to survive a Rule 12(b)(6) motion." *Hoffman v. Cemex, Inc.*, No. CIV.A. H-09-3144, 2009 WL 4825224, at *4 (S.D. Tex. Dec. 8, 2009) (Rosenthal, J.).

Interstaff relies on the Fifth Circuit's recent statement that "district courts should rigorously enforce at the outset of the litigation" the similarly-situated requirement. *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 443 (5th Cir. 2021). *Swales* rejected the conditional-certification procedure that courts had previously used to analyze FLSA collective-action claims, but did not specify the procedure that should be applied. *Swales* was an appeal from an order granting a motion to conditionally certify a collective action, not from an order granting a motion to dismiss. *See id.* at 433–34. The *Swales* court directed courts to first "authorize preliminary discovery"

18

based on the needs of each case. *Id.* at 441–42. The *Swales* court noted that if the plaintiffs "have demonstrably different work experiences," "more discovery" may be needed "to determine whether notice is going out to those 'similarly situated.'" *Id.* at 442. Although *Swales* directed courts to resolve the collective-action issue "as early as possible," *id.* at 441, it did not require courts to adjudicate collective-action claims before the plaintiffs' certification motion is filed and before the discovery the Fifth Circuit recognized may be needed to rule on certification.

The proposed collective action is defined with sufficient specificity to avoid dismissal at this stage. The collective is defined as:

> All current and former hourly paid, non-exempt nurses that worked for Interstaff at a U.S. healthcare facility which contracted with Interstaff during the past three years and who were required to complete off-the-clock trainings, and/or received extra payments, including but not limited to shift differentials, housing stipends, and bonuses, and who worked more than forty (40) hours in at least one workweek ("FLSA Collective" or "Collective Members").

(Docket Entry No. 1 ¶ 25). The definition identifies those nurses who: (1)(a) were not paid for required off-the-clock training or (b) received additional non-discretionary compensation; (2) and worked over forty hours in at least one work week. The complaint alleges that Interstaff applied a common policy and plan that did not compensate nurses who worked off-the-clock for training and did not receive overtime, or who received payments not included in their regular rate of pay, and who worked more than 40 hours in a workweek. (*Id.* ¶¶ 90–113).

The motion to dismiss or strike the collective-action claims at this stage is denied.

## C.    The Jury Waiver

"The right to a jury trial in federal court is a question of federal law." *Whitney Nat'l Bank v. Air Ambulance by B & C Flight Mgmt. Inc.*, No. CIV.A. H-04-2220, 2006 WL 3741903, at *3 (S.D. Tex. Dec. 15, 2006) (citing *RDO Financial Serv's Co. v. Powell*, 191 F.Supp.2d 811, 813 at n.5 (N.D. Tex. 2002)). Although the Seventh Amendment protects the right to a civil jury trial,

that right can be waived by the parties' written agreement. *Id.* (citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)). Agreements waiving the right to jury trial are neither illegal nor contrary to public policy. *Westside-Marrero Jeep Eagle, Inc. v. Chrysler Corp., Inc.*, 56 F. Supp. 2d 694, 706 (E. D. La. 1999) (citing *McCarthy v. Wynne*, 126 F.2d 620, 623 (10th Cir. 1942)). A jury trial waiver must be made knowingly and voluntarily, and courts will indulge every reasonable presumption against finding waiver. *Whitney Nat' Bank*, 2006 WL 3741903, at *3 (citing *RDO Financial*, 191 F.Supp.2d at 813). "The factors used by federal courts to decide whether a waiver was made knowingly, voluntarily, and intelligently include: (1) whether there was gross disparity in bargaining power between the parties; (2) the business or professional experience of the party opposing the waiver; (3) whether the opposing party had an opportunity to negotiate contract terms; and (4) whether the clause containing the waiver was inconspicuous." *Id.*

> Each contract that the nurses signed includes the following jury waiver:
>
> Jury Waiver. YOU AND INTERSTAFF WAIVE A TRIAL BY JURY OF ANY AND ALL ISSUES ARISING IN ANY ACTION OR PROCEEDING BETWEEN YOU AND INTERSTAFF, INCLUDING BUT NOT LIMITED TO ANY ACTION OR PROCEEDING ARISING OUT OF, UNDER, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR THE SUBJECT MATTER OF ANY OF ITS PROVISIONS. YOU AND INTERSTAFF UNDERSTAND THAT AND CLAIM BETWEEN YOU AND INTERSTAFF WILL BE DECIDED BY A JUDGE RATHER THAN A JURY AS A RESULT OF THIS AGREEMENT.

(Docket Entry No. 1-7 at 6). This waiver is conspicuous, *Whitney Nat' Bank*, 2006 WL 3741903, at *6, but the remaining factors weigh against waiving the jury-trial right.

The complaint alleges that there was no "opportunity for negotiation," *BMC Software, Inc. v. Int'l Bus. Machines Corp.*, No. CV H-17-2254, 2018 WL 7291425, at *3 (S.D. Tex. Aug. 30, 2018), and that there was an extreme bargaining disadvantage, *Zavala v. Aaron's, Inc.*, No. 4:15-CV-123, 2015 WL 5604766, at *3 (E.D. Tex. Sept. 23, 2015). Nyawara signed two contracts with

20

Interstaff in April and December 2021, neither of which contained the jury waiver but both of which threatened substantial penalties and consequential damages if she failed to arrive in the United States to work.  (Docket Entry No. 1 ¶¶ 121, 129).  Just one month before Nyawara's embassy interview, Interstaff required her to sign a new contract with a jury waiver as a condition of obtaining the documents she needed for her embassy interview.  (*Id.* ¶ 137).  Nyawara alleges that if she did not sign the new contract, her embassy interview would have been rescheduled for months later, she could have lost her opportunity to work in the United States, and she would have suffered the financial penalties set out in the previous contracts she signed.  (*Id.* ¶¶ 141–42).  Last-minute contract changes under short time constraints weigh heavily against enforcing a jury waiver.  *See, e.g.*, *Servicios Comerciales Lamosa, S.A. de C.V. v. De la Rosa*, 328 F. Supp. 3d 598, 622 (N.D. Tex. 2018).  In addition, Nyawara had not lived in the United States before signing the jury waiver, did not understand U.S. law, and had no opportunity to consider the jury waiver.  (*Id.* ¶ 136).  Nyawara effectively alleges that the jury-trial waiver is part and parcel of Interstaff's scheme to exploit its nurses.

Based on the complaint allegations, the motion to strike the jury demand is denied.

## IV.   Conclusion

For these reasons, the motions to dismiss and to strike, (Docket Entry Nos. 17, 18), are denied.

SIGNED on July 10, 2026, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge

21